Berenice Capstick, a Minor, by Matilda Capstick, Her Next Friend, v. T. M. Sayman Products Company, Appellant.—34 S. W. (2d) 480.

Division Two, December 31, 1930.

*Jones, Hocker, Sullivan & Angert, W. A. McCaleb* and *Sid C. Roach* for appellant.

4

*Igoe, Carroll, Higgs & Keefe* and *Joseph A. Lennon* for respondent.

COOLEY, C.—Plaintiff obtained a verdict for $45,000 against defendant in the Circuit Court of the City of St. Louis for personal injuries sustained while in defendant's employ. The court required her to remit $20,000 of the verdict, which she did, and judgment was entered for $25,000. Defendant appealed.

Plaintiff was injured in February, 1926, by slipping and falling while descending a short flight of stairs in defendant's building, owing, it is claimed, to the condition of the steps and the lack of light in the stairway. She was then about seventeen years of age and was and had been for about a year employed by defendant as a typist. The stairs on which she fell are to the rear of a large office room on the ground floor of defendant's building in which she and about one hundred other women worked. The steps occupy the width of a hall, $4\frac{1}{4}$ feet wide, leading from the office to the cloak room and the wash and toilet room used by the women employees. There is a hand rail attached to the wall on each side of the steps. Access to the hall is through a door between it and the office. The stairway leads up to a mezzanine floor or landing about $4\frac{1}{2}$ feet long, at the end of which is a door opening into the cloak room, and on the left of the landing (as one faces the cloak room door) there is a door opening into the wash room. There are eight steps in the stairway, counting the landing in ascending or the floor in descending as a step. The bottom step is fifteen inches from the door opening from the office into the hall. The hall is entirely enclosed by ceiling and walls, broken only by the doors mentioned. No natural light enters it.

The evidence in plaintiff's favor tended to show the following: The surfaces of the steps were made of "rich" concrete finish, composed of about equal portions of fine sand and cement worked hard and smooth with a steel trowel, and had become very "slick" or "slippery." There was evidence of wear on the treads, more in the central portions than near the ends of the treads (next the walls). The edges or "noses" of the treads were rounded and worn, one witness, a cement finisher, testifying that they were badly worn for a distance of about an inch back from the edges, in some places the "finish," which was shown to have been originally half or three-fourths of an inch thick, being practically worn off. The treads were slick at the rounded edges as well as farther back. There were slight variations in the widths of the treads and the heights of the risers, the former varying from $9\frac{1}{2}$ to $10\frac{1}{8}$ inches and the latter

from 7 to 7½ inches. There were also some slight variations of level at different points on the same tread. The treads were constructed with a slope or "dip" toward the front, so as to drain. The proper slope was shown to be a one-fourth-inch fall for a twelve or thirteen-inch tread, less for a narrower tread. Those in question varied from one-eighth to five-eighths of an inch. The only step, however, shown to have as much as five-eighths-inch fall was the fifth from the bottom, and plaintiff says she was at least half way down the stairs, which would be below that step, when she slipped. The usual construction, as to treads of widths similar to these, was to provide a coarser and non-slippery surface by using what is known as a Mason tread, or by giving the surface a "float" finish, which is coarser than a trowel finish, or by corrugating or roughening the surface. Such surfacing could have been applied to the steps in question practically and at small expense, either when they were first constructed or at any later time.

The light in the hall was dim. The only illumination of the stairway came from an electric light suspended from the ceiling about 7½ feet above the edge of the landing. It had a shade beneath it designed to diffuse the light and prevent glare. There was no light in the cloak room. There was an electric light in the wash room, the door of which was customarily and at the time of plaintiff's injury open, but while the light in the wash room was better than that in the hall it was not very bright and did not shed illumination on the stairway, which was below and at right angles to the line of light from the door of the wash room. The door at the foot of the stairs opening into the office was closed and usually so kept. It had an upper panel of rough or frosted glass, but the lower part, extending about to the height of the middle of the stairway, was of wood. There was good light in the office, but no light fixture directly in front of the door leading into the hall. Descending the stairs one had the suspended light in the hall at his back, and his shadow before him, tending to obscure the steps below. Ahead was the door with the upper panel of glass through which came light, but with the lower part of wood, fifteen inches from the bottom step, as the background of the lower steps. Plaintiff's evidence tends to show that the effect of the light from the upper part of the door in front of one descending the stairs tended rather to increase than to decrease the obscurity in which her witnesses said the lower half of the stairway was enveloped. Her evidence tended to show that the light in the hall was dim, and that the lower part of the stairs especially, including the place where she slipped, was so dark that one descending the stairs could hardly see the outlines of the steps. The last three or four steps, descending, appeared blurred.

On the occasion of her fall plaintiff was descending and had gotten half way or more down the stairs. She did not know on just which step she slipped. She testified that she 'was going carefully, looking where she stepped, but being unable in the dim light and with her shadow falling before her to see clearly the outline of the steps below her, she stepped too close to the rounded and worn edge of one of them and her foot slid on the slippery surface and over the edge, causing her to fall to the floor below. Her left knee struck the concrete floor violently, the resulting injury developing into a very serious one.

No contention is made that plaintiff was not acting within the scope of her employment.

Defendant's evidence, while showing that the surfaces of the steps were of hard and smooth concrete finish and showed some slight evidence of wear, strongly tended to show that they were well and properly constructed and in good condition, not slippery and with no sufficient irregularities or worn places to affect their safety, and were well lighted.

Plaintiff in her petition sets out the physical defects in the stairway and the conditions as to light which her evidence tended to show, by reason of all of which in combination she avers the stairway was not reasonably safe, and all of which in combination she claims caused her injury. The answer was a general denial and a plea of contributory negligence. The cause was submitted to the jury on the theory of the petition as above indicated.

I. Appellant contends first that its demurrer to the evidence should have been sustained because, (a) the condition of the steps as shown by the evidence did not warrant a finding of negligence; (b) the condition of the steps shown was not such as would lead a reasonably prudent employer to anticipate that injury would happen to a person using them; (c) the evidence did not connect plaintiff's fall with the alleged defective condition of the steps; and (d) plaintiff chose to walk in the middle of the stairway when she might have taken a safer way, viz., at one side thereof, holding to the hand rail.

Appellant cites many cases under (a), some of which hold that conditions of stairways or floors such as were here shown are not sufficiently dangerous or out of the ordinary as that their maintenance in such condition constitutes negligence or that danger to those using them should be anticipated, and others which hold that where no defect in steps or floors is shown failure to provide sufficient light is not sufficient to authorize recovery. Of the former, Myers v. Strauss (Mo.), 264 S. W. 801, and of the latter, Weller v. Consolidated Gas Co., 198 N. Y. 98, 91 S. E. 286, 139 Am. St. 798, are illustrative. None of the cases cited deals with a situation in which, as in the

instant case, the right of recovery was predicated upon the existence both of defects in the steps and insufficient light. The precise situation in this respect was considered by this court in Busby v. Southwestern Bell Tel. Co. (Mo.), 287 S. W. 434. The facts in that case, as to the negligence charged, the nature and cause of the accident and the manner in which it occurred are so similar, that the rulings announced in the Busby case, if correct, as we think they are, apply to this case. The chief difference in the facts is that in the Busby case the stair step on which the plaintiff slipped was slippery because wet, but that can make no difference in the principle involved. In this connection it may be observed also that appellant in this case contends that as it was not shown that any one had ever before slipped and fallen on these steps they must have been reasonably safe, and appellant could not have anticipated that such an accident would occur. In the Busby case over two hundred girls and women used the stairway at least eight times a day and it does not appear that any one had slipped thereon prior to the plaintiff's accident. In the Busby case the court held that plaintiff made a submissible case. Apropos, it said:

"As already stated, there was substantial evidence tending to show: (1) That the surfaces of the treads of the steps were worn and irregular, that of the sixth step markedly so; (2) that the steps were wet; (3) that there was not sufficient light to enable one passing down them to see the depressions and that the steps were wet; and (4) that these three conditions in combination caused plaintiff's fall and resulting injury. Can it be held as a matter of law that the conditions just mentioned did not render the stairway not reasonably safe? In determining that question cases holding that steps are not unsafe because worn smooth (Myers v. Strauss (Mo. Sup.), 264 S. W. 801), or because wet (Williams v. Railway, 288 Mo. 11, 231 S. W. 54), are without influence. Nor are cases in point which hold that if there be enough light to disclose the existence and general character of the stairway, it is sufficient. [Weller v. Gas Co., 198 N. Y. 98, 91 N. E. 286, 139 Am. St. Rep. 708.] If in this case the steps had been worn and wet, but there had been light enough to plainly disclose those conditions to one using them, or if the light had only been sufficient to enable one to see the general outlines of the steps, and they had been dry and unimpaired by use, a different question would be presented. But with the three conditions operating should not the defendant have reasonably anticipated that they would cause injury to employees required to use the stairway? It was at least a question for the jury. Nor can it be said as a matter of law that plaintiff in descending the steps was not in the exercise of ordinary care for her own safety."

See also Oakley v. Richards, 275 Mo. 266, 204 S. W. 504; Nephler v. Woodward, 200 Mo. 179, 98 S. W. 488.

There is no merit in the claim that the evidence does not connect plaintiff's fall with the alleged defective condition of the step. Her own testimony clearly so connects it. Nor do we think there is merit in the contention that the demurrer should have been sustained on the ground that she voluntarily chose a dangerous way when she might have chosen a safer one. All of the evidence shows that those who used the stairway generally walked about where plaintiff was walking because the steps were most worn in the middle portions thereof. It was not shown that she did not have hold of the hand rail. She was not asked about that. So far as shown by the evidence she was using the stairway as it was customarily used. The cases cited by appellant in support of this contention are based on essentially different facts and are not applicable. Clearly, plaintiff can not be declared guilty of contributory negligence barring recovery as a matter of law.

After careful consideration of the evidence, including the original exhibits which by agreement of counsel were filed here, we are of the opinion that plaintiff was entitled to have her case submitted to the jury and that the demurrer was properly overruled.

II. Error is assigned in that plaintiff was permitted to prove that Mason treads could have been placed on the stair steps at small

expense, because the master is not required to use the newest, best or safest appliances and because negligence cannot be shown by proof of failure to follow the usual methods.

Prior to the introduction of the evidence complained of, appellant had shown on cross-examination of a witness of plaintiff's that concrete steps were in common use in factories in St. Louis, and had sought to show that those in its building were no different from those in other such buildings, the witness's answer to a question about the latter point not being clear. Plaintiff's counsel later asked one of her witnesses what was the practice and usage in St. Louis as to the kind of finish put on concrete steps inside of a building. Defendant objected and the court sustained the objection. Defendant then withdrew its objection, whereupon, without further objection, proof was made that it was customary where there was any considerable "traffic" to use a Mason tread or a float finish. The Mason tread and its purpose and effectiveness to prevent slipping and how it is put .on were described and it was shown that such treads can be installed when the steps are being built or put on afterwards. All that evidence was given without objection. Then the witness was asked how long it would take and what it would cost to equip the

steps in question with such treads, whereupon defendant objected on the ground that it was "immaterial to the issues in this case."

There was no objection to the evidence that it was customary to use such treads. Indeed, in view of the fact that, after the court had indicated by sustaining defendant's first objection that he would exclude such evidence, defendant withdrew the objection, the court had a right to assume that defendant was consenting that the question be gone into. Having thus consented to the bringing of that issue into the case and to proof of the custom and that such treads could be installed after the steps had been constructed, we are unable to see how defendant could have been prejudiced or what legitimate complaint it can now have for that the court permitted the further evidence, germane to that subject, that the cost in time and money would be small.

The jury was not permitted to find negligence upon a finding that defendant had not followed custom or usage in constructing or maintaining the steps. No reference to that matter was made in the instructions. The jury was required to find, not that the stairway could have been made safer, but that in its then condition it was not reasonably safe.

We see no prejudicial error in the admission of the evidence complained of. In so disposing of this point we do not mean to intimate that evidence as to the customary way of doing a thing regarding which negligence is charged may not be admissible as tending to support the charge of negligence made. We have examined the cases cited pro and con, but deem it unnecessary for the reasons stated to discuss the point further.

III. Complaint is made of plaintiff's main instruction for that the only respect in which it required a finding of negligence was defendant's failure to furnish more light and to correct the irregularities in the steps and before any question of repair could arise it was necessary for the jury to find negligence in the maintenance of the steps in their existing condition. It is further claimed that the instruction was confusing and misleading, that it did not require the jury to find that defendant should have anticipated that injury would result from use of the stairway and that it assumed that the stairway was not reasonably safe. The instruction is long. As fairly epitomized in respondent's brief it required the jury to find:

(1) That the plaintiff slipped and fell on the stairway and thereby was injured: (2) That the steps were very slick or slippery and the treads thereof worn and irregular and sloped at varying degrees: (3) That the stairway was not sufficiently lighted to enable persons descending the same with ordinary care to see clearly the outlines

of the steps and treads: (4) That, "because of the slick and irregular character of the surfaces of said steps (if you find the surfaces of said steps were slick and irregular) and the insufficient lighting of said stairway (if you find the lighting of the stairway was insufficient in the aforesaid particulars) persons descending said stairway were subjected to the danger of slipping and falling thereon;" (5) That in the particulars aforesaid the stairway was not reasonably safe: (6) That the defendant knew, or in the exercise of ordinary care should have known of the slick and irregular character of the treads (if the jury found that such conditions existed) and of the insufficiency of the lighting thereof (if it found that the lighting thereof was insufficient as aforesaid) in time to have corrected such conditions and to have provided light sufficient in the aforesaid particulars and thereby have made said stairway reasonably safe (if the jury should so find): (7) That it failed to correct said conditions and to provide light sufficient in the aforesaid particulars— that is, failed to do either of said things: (8) That in so failing defendant was negligent: (9) That the plaintiff's fall "was directly and proximately due to the slippery condition of said stairs and the irregularities with respect thereto and the lack of sufficient light as herein before mentioned.

We think the instruction sufficient and not subject to the criticisms leveled against it.

IV. Appellant contends that the verdict is excessive even after the *remittitur* ordered by the trial court, and should be further reduced to not more than $15,000.

At the time of her injury plaintiff's knee stung and pained her. In the following few months the knee became swollen and painful and steadily grew worse. After about a month she went to a doctor but treatments failed to alleviate the pain and swelling which continued to grow worse. In September or October of 1926 (the accident had happened in February of that year) X-rays were taken and she was taken to a hospital where an operation was performed. Plaintiff was shown to have an infection of the bone called sarcoma which had resulted from the injury. She remained in the hospital for about three weeks and then was brought home, where she was kept in bed and received medical treatment every day. It was the latter part of December before she was able to get out of bed. Thereafter she used crutches for about three months and at the time of the trial (November, 1927) was not able to walk without the aid of a cane "or somebody to lean on." Since the operation the leg had been, and was at the time of the trial, shrunken and misshapen and the knee was enlarged. Until three weeks before the trial she had been going to the doctor twice a week. The movements of the leg at

the knee were considerably restricted and whenever she walked or stepped on it it hurt. She was unable, as she testified, to do anything without "getting tired right away," and suffered from pains in her back in addition to those in her leg. She could not bear her full weight on the left leg, had suffered a loss in weight and had been unable to do any work. Prior to her injury she had been earning $16 per week and had enjoyed good health.

Sarcoma is a condition resulting from infection sometimes caused by traumatic injury. A tumor is formed on the bone and gradually the marrow thereof is eaten away. It is progressive and goes either up or down. At the time when plaintiff was operated upon it was found that there was a large tumor and that about three inches of the bone above her knee had become affected. This bone was removed. Although at the time of the operation it seemed that all of the affected bone had been removed, the leg at the knee joint continued to swell thereafter, indicating that infection still remained and that the disease was making further inroads. Another operation may arrest the progress of the disease, but each succeeding operation is more difficult. Dr. Smith, testifying for the defendant, said that sometimes several operations were required in such cases. The possibility of eliminating the sarcoma by such operation grows less with each attempt. If further local operations fail to effect this result, plaintiff's leg will have to be amputated at a point about midway between the knee and hip, and Dr. Tyzzer testified that in his opinion an amputation would be necessary.

Dr. Kleinfelder, a specialist in bone surgery, whose qualifications were admitted, was asked as to the possibility of removing the tumor so as to avoid the necessity of amputation, and he answered: "I would say it is possible, but it would be a question of at least two years' work for the patient to make a leg that would sustain her if this was properly removed, and if it is not properly removed it will recur, and of course one cannot always remove all of these tumors, especially where they are adjacent to a knee joint, and particularly if the bones are involved on both sides of the knee joint, and it is quite probable it is traveling straight across the joint and other structures are involved and render it impossible to remove to make a workable knee."

The testimony of the medical experts as a whole indicates that it is highly probable such amputation will be necessary. It showed that there were several kinds of sarcoma, some of which are malignant and some non-malignant. The infection of a malignant sarcoma sometimes gets into the blood stream, and the defendant's medical expert testified that such a sarcoma tends to cause death. The same witness also testified that if the tumor is a rapidly growing one "it makes us suspect it is malignant." By two of the

plaintiff's medical experts facts were shown indicating that the sarcoma was progressing and had made considerable further inroads upon the healthy bone since the operation had been performed, and Dr. Tyzzer, one of these experts, testified that in his opinion, "from the way the leg is getting worse from day to day," the tumor is malignant. It is not shown by the evidence that the infection has as yet permeated the blood stream or spread beyond the locality of the knee, including the lower part of the femur and upper part of the tibia, both of which are affected.

Dr. Kleinfelder further testified that from his X-ray examination and the history of the case the tumor appeared to be "a tumor that travels," which we understand from the evidence indicates that it is probably malignant. He also testified that all malignant sarcoma affects the blood sooner or later.

It is apparent that if plaintiff's leg can be saved at all she will be subjected to much further suffering and expense and will at best in all probability be left with an immobile knee. There was substantial evidence from which the jury could have found (and from the size of the verdict we think likely did find) that plaintiff's tumor was of a malignant type, likely to get into the blood stream, if it had not already done so, thus threatening not only plaintiff's health but her life, especially if amputation is delayed in the hope of saving the leg by local operation, as would be but natural.

Appellant cites a number of cases from this court in which sums ranging from $10,000 to $15,000 were allowed for loss of a leg, the latest of such cases being Stahl v. St. L.-S. F. Ry. Co., 287 S. W. 628, in which a man thirty-five years of age, earning $120 per month, recovered a verdict of $20,000 for loss of a leg (amputated six inches below the body), there being no other injury shown, and the verdict was reduced to $15,000 by this court. Respondent cites among other cases, Schroeder v. Wells, 298 S. W. 806, in which a carpenter capable of large earnings at his trade, and who because of the injury could no longer work at that trade and was earning $35 a week at other work, was allowed $17,000 for loss of the left hand except thumb and forefinger; Evans v. General Explosives Co., 293 Mo. 364, 239 S. W. 487, in which we affirmed a verdict of $20,000 in favor of a seventeen-year-old boy for loss of his right arm at the shoulder.

If the worst plaintiff had to anticipate were the amputation of her leg. we would consider $25,000 an excessive award in view of numerous prior decisions. But in this case there is not only the prospective loss of her leg, with the physical and mental suffering she must endure and the deprivation of her right to the enjoyment in her young womanhood and through life of opportunities for usefulness and happiness in the possession of sound health and a normal

body, but there must be taken into consideration the substantial evidence tending to show that the tumor in question is of a malignant type, likely to get into the blood stream if it has not already done so, carrying the infection to other parts of the body and threatening not only plaintiff's health but her life. In view of all these circumstances we cannot say that the amount of the judgment "goes unmistakably beyond the bounds of reason," and unless it does so we have held that an appellate court will not interfere with an award approved by the trial court. See Manley v. Wells, 292 S. W. 67, 69, and authorities cited. The judgment of the circuit court is affirmed. *Davis, C.,* concurs.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All of the judges concur.