GEORGE W. HIGGINS, (Plaintiff) Respondent, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, (Defendant) Appellant, No. 42180—241 S. W. (2d) 380.

Division One, July 9, 1951.

*Warner Fuller* and *Arnot L. Sheppard* for appellant.

266

*Harold O. Piening, E. D. Franey* and *Hay & Flanagan* for respondent.

270

VAN.OSDOL, C.—In this action under the Federal Employers' Liability Act, 45 U. S. C. A. § 51 et seq., the jury returned a $45,000 verdict for plaintiff, and defendant has appealed from the ensuing judgment.

Plaintiff was injured while working for defendant as a subforeman of a car-repair crew. He fell down the steps of defendant's switch shanty located in defendant's yards at a point a few feet east of Ewing Avenue and a little south of Atlantic Avenue in St. Louis.

Plaintiff had alleged and plaintiff's case was submitted to the jury on the theory that defendant had failed to exercise ordinary care to furnish plaintiff with a reasonably safe place to work in that defendant "negligently suffered and permitted water to leak from the radiator in the shanty - - - onto the floor thereof"; and that plaintiff in the performance of his duties went into the shanty and, when he was leaving, the water on the shanty floor caused him to slip and fall down the concrete steps, and to suffer serious injury.

Herein upon appeal, defendant-appellant contends (1) plaintiff failed to make out a submissible case; (2) the trial court erred in refusing or failing to declare a mistrial or to reprimand plaintiff's counsel for asserted unfair tactics in the progress of the trial, for persistently attempting to introduce incompetent evidence, and for referring to defendant as a "big corporation" in argument to the jury; and (3) the Instructions Nos. 1, 2 and 3, given at plaintiff's instance, were erroneous. Defendant-appellant further contends (4) the amount of the jury's award, $45,000, was grossly excessive. In endeavoring to adequately treat with these contentions it is necessary to make a rather extensive statement of the evidence.

On Christmas morning, 1946, plaintiff reported to defendant's yards for work. Plaintiff and his crew of four men, Lamkin, Turnbull, Misko and Hamilton, assembled at 8:30 o'clock. There was no work for them to do, and it was suggested by their foreman that they should go into a nearby Wabash passenger car where it was warm. (At 9:00 o'clock the temperature was 34°; at noon, 45°; and at 3:00 in the afternoon, 59°.) While plaintiff and his repair crew (except Hamilton, who was sent elsewhere) were in the warm passenger car, one of the crew went out and bought a pint of bourbon whisky. The evidence tends to show that members of the crew drank the liquor, and later drank beer at lunchtime. Plaintiff denies he drank any whisky or beer, but there was evidence to the contrary. Plaintiff and his crew, except Hamilton, remained in the passenger car until 10:00 a. m., when they were assigned the repair of a Pullman car, "Tripoli." At 11:45, they went to lunch, returning to their work at 12:40, and finished their repair assignment about 2:35. It was plaintiff's duty to report to the yardmaster, Marlow, that the repaired Tripoli was ready for service and, at approximately 3:00 o'clock, plaintiff went to the switch shanty to telephone his report to the yardmaster's office.

The switch shanty faces southwardly. Entering the shanty from the south, one must walk up a flight of five concrete steps from a concrete landing 21" x 34" at about the ground level, the top step being a concrete platform 22" x 34" at the level of the concrete shanty floor. From the landing (at the ground level) the steps rise 39½" to the level of the platform and shanty floor. A beveled concrete "riser" about one inch ■ high and six inches wide extends

across the threshold of the shanty's front door. Iron hand railings are fixed on either side of the door. These railings slope parallel with the approach of the steps.

The frame-shanty building is heated by a "radiator" consisting of six horizontal steampipes along part of the west wall. The horizontal steampipes merge into a vertical pipe of larger dimension. A petcock is set in the upper end of the vertical pipe, permitting drainage of the radiator; and a hose, attached to the outlet of the petcock, extends to and passes through a cardboard tacked over the lower sash of a window in the shanty's west wall. A toilet and shower room is partitioned off of the main south room. The main south room contains a stove, a telephone and chairs. The shanty also houses a drinking fountain. There are no restrictions on employees' use of the shanty. They use the toilet and shower, the drinking fountain, the telephone; they rest in the main south room at times; and they may use the room for dining and resting during the lunch hour.

Plaintiff introduced evidence tending to show that water leaked out of the petcock-hose connection and passed down to the floor and trickled over to the threshold of the south door. "The water came from a radiator - - - and every time the steam was on - - - why this radiator would leak and that water came off the radiator and down towards the door, because the floor sloped slightly - - - out to the door - - -. It's a chronic affair." The concrete floor is practically "as smooth as that desk." The leak had been reported several times, and repairs were made "but then it pumped out again." A witness testified the radiator had leaked "off and on for three years." Another witness said the floor was wet during the winter months "pretty near all the time." Misko, a witness for plaintiff, testified the floor was wet at 9:30 the morning of December 25th, the water "was formed right before the sill." Turnbull, a witness for defendant, testified he went into the switch shanty about 3:00 o'clock—"The floor was wet." The wet area "was about three or four feet from the radiator to the door." On the ground of surprise, defendant's counsel was permitted to cross-examine the witness Turnbull.

Plaintiff testified that (having used the telephone in the switch shanty to report the repaired Tripoli was ready for service) he talked momentarily to Turnbull, who was then in the shanty toilet, and started out the south shanty door; "I got approximately fifteen inches or so from the door, which was open, when my right foot slipped and banged me up against the door frame on the right side of the shanty, catapulting me out the door, straight down the steps, or wherever I hit." Plaintiff said that water on the floor caused him to slip, "which I had seen when I came in the shanty, which was an everyday affair." Plaintiff was interrogated concerning a former statement to defendant's claim department purportedly as follows, "Well, as I started out of the shanty after notifying Mr. Turnbull

what to do, as I approached the entrance on the way out my right foot slipped on the water-covered concrete floor, striking this riser, which threw me off of my balance, because I was pitched forward when I struck the riser, and in throwing me off my balance my right side struck the door frame, on the west side of the door frame, pitching me forward down the steps, and I made a grab to catch the hand railing on the east side - - -.'' Plaintiff explained, ''that's the way the accident returned to my mind at the time. - - - I stated there was only one thing I could strike when my foot slipped, the riser on the sill, it was the only protruding thing to throw me off my balance otherwise and flopped.''

After his fall, the unconscious plaintiff was carried up the steps and laid on the floor of the shanty. There was testimony plaintiff was laid on the floor immediately within the door. (This testimony is urged by defendant as evidence the floor at the door was not wet, the inference being that no one would have laid plaintiff down on a wet floor.) The witness Turnbull testified plaintiff was laid in ''the middle of the floor - - - three feet north of the doorway.'' Some of the witnesses for defendant said the floor was dry. Others were unable to state whether the floor was wet or dry.

There was also evidence plaintiff was ''standing perfectly still'' on the platform immediately before he ''started to fall - - -. Whether he came out of the shanty or not I don't know.'' One witness said he saw a bunch of men standing on the platform, and plaintiff fell ''like you would chop a tree down - - - just toppled.'' Another witness testified he only saw plaintiff in the ''middle of the act'' of falling.

██ (1) In examining the question of the submissibility of plaintiff's case, we bear in mind that under our system of administration of justice the jury has the sole responsibility of finding facts in actions at law wherein, as in the instant action, the factual issues are submitted to them, so that when a case is submitted to them upon substantial evidence, on correct instructions telling them the facts essential to their verdict, it is not the function of the appellate court to disagree with their view as to what are the true facts. Hardin v. Illinois Central R. Co., 334 Mo. 1169, 70 S. W. 2d 1075; Pashea v. Terminal R. Ass'n. of St. Louis, 350 Mo. 132, 165 S. W. 2d 691; Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S. W. 2d 418.

██ Defendant-appellant contends the evidence relied on by plaintiff is wholly insufficient to establish the presence of water on the floor; or that water came from a leaky radiator; or that the presence of water created a hazard. Defendant urges that plaintiff's own testimony is in conflict with physical laws, and is so lacking in substance ''as to leave one fumbling in the dark'' to determine whether or not he ever saw water on the floor. Defendant further asserts that, of all the other men in the shanty that afternoon, none other than plaintiff

testified there was water on the floor except Turnbull and Misko. Defendant argues that Misko's testimony was unquestionably false; and Turnbull's testimony was self-contradictory and wholly untrustworthy. Defendant says Turnbull's testimony was contradicted by practically all the witnesses; and defendant remarks that Turnbull testified the unconscious plaintiff was laid in the middle of the shanty, whereas other witnesses said they laid plaintiff at or very near the doorway.

Turnbull's testimony relating to the place where plaintiff was laid on the shanty floor *was* in conflict with the testimony of other witnesses; and Misko, who testified there was water on the shanty floor at 9:30 in the morning, also stated that he was in the Wabash passenger car at a "quarter to ten, or 9:30, or 10:00." The conflicts of Turnbull's testimony with that of other witnesses did not as a matter of law destroy the probative substantiality of his testimony; nor did Misko's equivocal testimony of his presence in the passenger car at 9:30, 9:45 or 10:00, as a matter of law, destroy his testimony that he had seen water on the shanty floor at 9:30. Such conflicts and apparent inconsistencies were matters for the jury's consideration. It seems to us defendant seeks to have this court resolve the credibility of the witnesses and weigh their testimony, whereas it is axiomatic that such is the jury's province.

■ Of like character is defendant's contention that plaintiff's own testimony is self-destructive. The fact that plaintiff upon cross-examination admitted he did not actually see the water on the shanty floor, when he started out the shanty door, does not destroy his testimony tending to show there was water on the shanty floor. He testified he had seen the water on the floor but a few minutes before when he came in the door. Of course, he could now (at the time of trial in March, 1950) say, "I would have to assume it was still there"; just as the jury could reasonably and probably did infer the water was still on the floor since there was testimony it was there a few minutes before. Plaintiff had made a former statement (in August, 1947) to defendant's claim department in which he said that, when he went in the shanty, he paid no "attention to it, but I presume it (the water) was there." (Likewise, Turnbull had made prior statements which statements were contrary to some of his testimony at the trial.) Now, such prior statements of a witness, even though the witness ■ is a party, while admissible for impeachment, do not destroy the prima facie probative effect of the contrary testimony of the witness at the subsequent trial. Goslin v. Kurn, 351 Mo. 395, 173 S. W. 2d 79; Moses v. Kansas City Public Service Co., 239 Mo. App. 361, 188 S. W. 2d 538; Swift v. St. Louis-San Francisco R. Co., Mo. App., 15 S. W. 2d 964.

■ Defendant-appellant further contends that neither of plaintiff's "versions" of the way he fell may be accepted because they all

conflict with well-known physical laws. Defendant argues that, if plaintiff's right foot slipped forward without coming into contact with the riser, plaintiff's body would have had a tendency to fall backward. And, defendant says, if plaintiff's foot in slipping forward caused his body to become off balance backwardly, plaintiff's body could not have been caused to be "catapulted" out of the door by the contact of his right foot with the riser in the doorway. It would seem defendant's contention calls for conclusions we could not surely make, for we cannot know all of the factors of motion, poise, equilibrium or balance and counter-balance, and resistance or reaction of contacting surfaces or colliding objects which may have come into play in precipitating plaintiff's fall. We believe we cannot say either of plaintiff's versions of the manner of his fall is manifestly untrue and impossible because opposed to the immutable laws of physics. "So frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except where they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other." 10 R. C. L. 1009; Pashea v. Terminal R. Ass'n. of St. Louis, supra; Doyle v. St. Louis Merchants' Bridge Terminal R. Co., 326 Mo. 425, 31 S. W. 2d 1010; Benjamin v. Metropolitan St. Ry. Co., 245 Mo. 598, 151 S. W. 91.

■ We are of the opinion there was substantial evidence there was water on the smooth concrete floor which caused plaintiff to slip and fall; the water came from the leaky radiator; and, because of the water, the smooth floor was not reasonably safe. Substantial evidence sustained reasonable inferences, when all the circumstances are considered, especially the location of the shanty and the nature of its use by defendant's employees, that defendant, in the exercise of ordinary care, should have known of and remedied the unsafe condition. Although defendant-appellant argues the contrary, we think the question of negligence was for the jury, even though there was evidence tending to show that no one had fallen on the wet floor before plaintiff fell (Capstick v. T. M. Sayman Products Co., 327 Mo. 1, 34 S. W. 2d 480); and even though plaintiff and other witnesses were asked to say and did say it had not occurred to them that the wet floor was hazardous. It was for the jury, not the witnesses, to determine from all of the evidence whether the floor was reasonably safe. Eubank v. City of Edina, 88 Mo. 650.

■ (2) In interrogating a witness, Hardaway, a representative of defendant's claim department, defendant's counsel was using a former statement purportedly made by the witness Misko; and was asking the witness Hardaway concerning his conversation with Misko when Misko's statement was procured by the witness. It seems the Misko statement was attached to the defendant's "private trial file." Plaintiff's counsel said, "Let me have that a minute. - - - I want

this, the whole thing.'' Defendant's counsel asked for a mistrial, saying, ''Counsel well knows he has gone far beyond the limits, demanding my trial memorandum.'' The trial judge ruled, ''The request for a mistrial will be denied. You're getting the statement he had reference to, are you, Mr. Sheppard?'' Defendant's counsel replied, ''Yes, sir. I certainly am, and I am now handing it to counsel on the other side.'' A demand in the jury's presence for a party's ''trial memorandum'' should be considered improper as tending to put the party in a prejudicial position before the jury. Compare Walsh v. Terminal R. Ass'n. of St. Louis, 353 Mo. 458, 182 S. W. 2d 607; Wilkerson v. Missouri Pac. R. Co., Mo. App., 69 S. W. 2d 299. In the instant case it is not clear plaintiff's counsel was demanding more than Misko's written statement, although we do not doubt that defendant's counsel thought the demand was for his entire ''trial memorandum.'' The trial court was exercising discretion in refusing to order a mistrial, and we do not believe the trial court's ruling was manifestly an abuse of discretion. The trial judge was in a good position to measure the tenor and effect of the incident including the language of counsel.

Defendant-appellant complains of leading and argumentative questions, and questions which might have elicited incompetent evidence, which questions were propounded by plaintiff's counsel in the progress of the trial. In at least two instances plaintiff's counsel manifested a tendency to override the trial court's correct rulings in sustaining objections. This was improper; but, we believe, the trial court justifiedly considered the incidents of no prejudicial effect. And plaintiff's counsel objectionably cautioned a witness not to refer to a particular fact because ''defendant's counsel was objecting,'' when the trial court's correct rulings sustaining defendant's objections had theretofore been made. In all instances of which defendant complains, the trial court sustained defendant's objections; and in most of these instances defendant requested no further action on the part of the trial court. Defendant should not now assert error of the trial court in failing to do more than defendant requested. However, there were instances in which the trial court sustained defendant's objections but denied defendant's further requests for orders declaring a mistrial, or for a reprimand of plaintiff's counsel. It must suffice for us to say we have examined all of the complaints of defendant-appellant relating to the trial court's rulings and have come to the conclusion the trial court did not abuse its discretion in its action in refusing the further requests.

In argument to the jury, plaintiff's counsel had been referring to the testimony of witnesses relating to drinking whisky the morning of December 25th; counsel continued, ''if they ever dwelt upon trying to make a gentleman drunk, this is the case, ladies and gentle-

men. I repeat, it irked me to no end to hear that. A big corporation who would seize upon something like that—

"Mr. Sheppard: I object to that. It's wholly unfair.

"The Court: Sustained.

"Mr. Sheppard: I think that counsel should be reprimanded for making such a statement.

"The Court: Yes. Stay within the evidence."

It seems plaintiff's counsel was about to make some scornful comment about defendant for undertaking to show that plaintiff had been drinking. By his manner of reference to defendant as a "big corporation," plaintiff's counsel, of course, was hoping to arouse some prejudice the jurors or some of them may have had for corporations, to help "drive home" to the jury counsel's scornful view of the conduct of defendant. This was improper and not within the scope of legitimate argument, and the trial court promptly and properly sustained defendant's objection. Defendant's counsel further suggested a reprimand, to which the trial court acceded, and did administer a mild sort of reprimand, or rather an admonition, "Stay within the evidence." Plaintiff's counsel did not further make reference to defendant as a corporation, and defendant's counsel did not then complain that the reprimand or admonition was not adequate, but seemed content with the trial court's entire ruling. The trial court did administer an admonition which the trial court considered appropriate, and we do not feel justified in holding the trial court did not fulfill its discretionary duty. Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S. W. 2d 115; Wendler v. People's House Furnishing Co., 165 Mo. 527, 65 S. W. 737.

(3) Plaintiff's principal Instruction No. 1 submitted that "defendant provided a steam radiator - - - and that said radiator leaked, and caused water to leak onto the concrete floor of said shanty, and if you further find from the evidence that plaintiff - - - went into said shanty to use the telephone - - - and if you further find that plaintiff walked upon the floor of said shanty and slipped upon water thereon - - - and fell and sustained injuries - - -."

Defendant complains that the instruction nowhere requires the jury to find that water was on the floor of the shanty as a result of a leak from the radiator. Defendant reminds us that plaintiff's whole case was bottomed on the premise the water on the shanty floor escaped from a defective radiator. It is true the instruction does not definitely submit that the water upon which plaintiff slipped came from the leaky radiator. Yet, by hypothesizing the leaky radiator "caused water to leak onto the concrete floor" and that plaintiff slipped upon water thereon, the jury must have understood it was intended they were to find the water was from the leaky radiator. But defendant seeks to invoke the rule expressed in State ex rel. Central

Coal & Coke Co. v. Ellison, 270 Mo. 645, 195 S. W. 722; Hogan v. Kansas City Public Service Co., 322 Mo. 1103, 19 S. W. 2d 707; State ex rel. Shell Petroleum Corporation v. Hostetter, 348 Mo. 841, 156 S. W. 2d 673, that verdict-directing instructions must not permit the jury to rove beyond the pleadings and the evidence. In the instant case, as we have said supra, there was substantial evidence the water on the floor came from the leaky radiator; there was no evidence the water came from a source other than the leaky radiator; and the trial court, at defendant's instance, gave Instruction No. 4 which directed a verdict for defendant unless the jury found, inter alia, that water was on the shanty floor ''which had come from a leaky radiator.''

We believe defendant's Instruction No. 4 by its clear and specific requirement cured and rendered harmless the somewhat indefinite or ambiguous language used in plaintiff's Instruction No. 1 in submitting an essential element of plaintiff's case. It is true that, if an instruction, purporting to cover the whole case and authorizing a verdict, leaves out any facts necessary to be found before the plaintiff is entitled to recover, it is erroneous; and, if such essential fact is left out, it is not cured by another instruction requiring the finding of such fact. In such a situation the two instructions would be conflicting. However, all instructions must be read and construed together, and where, taken together, they do contain a complete exposition of the law and cover every phase of the case, a verdict obtained thereon will be sustained, although some of the instructions taken separately may be incomplete and open to criticism. McDonald v. Kansas City Gas Co., 332 Mo. 356, 59 S. W. 2d 37, and cases therein cited; and Jensen v. Kansas City, 361 Mo. 967, 238 S. W. 2d 305.

Plaintiff's Instruction No. 2, defining negligence, reads as follows,

''The Court instructs the jury that by the term 'negligence' as used in these instructions, is meant the failure to exercise ordinary care which an ordinarily prudent person would exercise under the same or similar circumstances, and a failure to exercise that degree of care constitutes negligence.''

Defendant-appellant asserts the instruction is wholly meaningless and necessarily thereby confusing. We cannot recommend the form of the instruction, but we do not see how it could have been prejudicially misleading. Evidently the instruction was intended to convey that negligence means the failure to exercise ordinary care, and ordinary care means such care as a person of ordinary prudence would have exercised under the same or similar circumstances.

Instruction No. 3 given at plaintiff's instance advised the jury, ''in your deliberations you should not consider any contributory negligence on the part of the plaintiff as it has no bearing on the issues and is no defense in this case.'' Defendant argues that an instruction which brings into a case the subject of contributory negli-

gence, which, under the pleadings, is not made an issue, is confusing and misleading; and "served only to emphasize that plaintiff was entitled to recover." Defendant says negligence of plaintiff was not pleaded; "there was no proof of it, and as a consequence it had nothing to do with this case." A defendant-appellant made a somewhat similar contention upon which this court ruled adversely in Kleinlein v. Foskin, 321 Mo. 887, 13 S. W. 2d 648. It is indeed true that contributory negligence was not a defense. Defendant does not contend the instruction was prejudicial in depriving defendant of the jury's consideration of plaintiff's negligence in diminution of damages. 45 U. S. C. A. § 53. Defendant says there was no proof of any negligence of plaintiff. We consider the giving of the instruction was not prejudicial to defendant. Kleinlein v. Foskin, supra.

 (4) Plaintiff, forty-five or forty-six years old when injured, had worked for defendant for years. In falling, plaintiff sustained bruises, contusions and laceration of the brain. The injury was to the right temporal portion and frontal lobe. Plaintiff was unconscious or stuporous and irrational for twenty-one days. He was discharged from the hospital, January 31, 1947, and remained at home until October 22, 1947, when he reported for work and was assigned duties as a "rip track" man, in which work he has somewhat lighter work and receives forty cents per day less than the pay he would earn as a "gang leader." As a subforeman he had received $10.28 per weekday, and $15.42 for work on Sundays or holidays. He had reported to the hospital as an "out patient" for "checkups" thirty-six times. He was again in the hospital from November 9th to December 12, 1949, and again reported for work December 22, 1949. He lost $3,381 in wages.

When he was released from the hospital, January 31st, plaintiff rested at home in his bed a greater portion of each day. In taking occasional walks, "he didn't take a swinging step, as a man ordinarily does." He walked "slumped down" and shuffled his feet. However, his physician doubts the permanent impairment of gait. Plaintiff has lost weight and is not "jolly" as before his injury. He "don't look like the fellow he used to be."

The damage to the brain will leave a "definite residual," that is, as we understand it, the injury has had a definite permanent effect. There is "the question of potential convulsive seizures," and there is the probability of perseveration of speech. He will have permanent emotional instability. Two to four per cent of patients sustaining brain injuries have convulsive seizures. While confined in the hospital during January 1947, plaintiff had "quite a few" convulsions. There is no evidence he has had a convulsive seizure since his early hospitalization. If plaintiff "falls in the unfortunate group - - - where he develops convulsive seizures," he will have difficulty in pro-

curing gainful employment. He also sustained permanent injury to the right eye, reducing the vision to 20/50. This condition in all probability will remain "quiescent." It was necessary to extract all but four of his upper teeth, with resultant necessary use of a denture.

Considering the evidence tending to show the nature and extent of plaintiff's injuries from a standpoint favorable to plaintiff, and having a regard for the principles which govern our consideration of the question of the excessiveness of an award, we have come to the conclusion the amount is excessive. In the case of O'Brien v. Louisville & Nashville R. Co., 360 Mo. 229, 227 S. W. 2d 690, an award of $55,000 (after a remittitur had been required in the trial court) was further reduced to $30,000. In the O'Brien case, the plaintiff's injuries were a partial paralysis of the entire left side of the body, and almost total blindness of the left eye. There was an involvement of the brain, an hysterical neurosis. The plaintiff could not use his left arm to any appreciable extent. The plaintiff, thirty-three years old (younger than plaintiff in the instant case), had an average wage of about $300 per month as a switchman. After his injury, he could not perform tasks requiring normal agility and strength, but performed small tasks not requiring much physical effort. At the time of the trial he was engaged in the dairying business. See also Prince v. Kansas City Southern R. Co., 360 Mo. 580, 229 S. W. 2d 568; Smiley v. St. Louis-San Francisco Ry. Co., 359 Mo. 474, 222 S. W. 2d 481.

If within fifteen days plaintiff remits $17,500, the judgment should stand as of the date of its rendition; otherwise the cause should be reversed and remanded.

It is so ordered. ▮▮ *Lozier* and *Coil, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.