**Roy G. MILLER, Respondent,**

**v.**

**RANSON AND COMPANY, Inc., Appellant.**

**No. 24389.**

Kansas City Court of Appeals.

Missouri.

June 6, 1966.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 3, 1966.

Application to Transfer Denied Nov. 14, 1966.

C. Thomas Carr, Sheridan, Sanders, Peters, Carr & Sharp, Kansas City, for appellant.

Rodger J. Walsh, Kansas City, Rafter, Biersmith & Walsh, Kansas City, of counsel, for respondent.

HOWARD, Judge.

This is a suit by the plaintiff below to recover commissions he claims to be due him under his employment contract with the defendant below. Trial to a jury resulted in verdict and judgment for plaintiff in the amount of $8,800.00 and a verdict and judgment for defendant, on its counterclaim, in the amount of $959.90. The defendant has duly appealed to this court from plaintiff's judgment. Plaintiff did not appeal.

The defendant Ranson and Company, Inc. is an investment banking corporation specializing in municipal bonds. It is this specialized aspect of the business that is involved in the case at bar. It appears that in the business of underwriting municipal bonds, as conducted by defendant and the other companies which participated with defendant in the underwriting, that the investment bankers, through their agents and employees known as "buyers", initiate the idea that a town or city might purchase or construct a natural gas distribution system, or other similar municipal utility. They then try to interest the city officials in such a project, and if they are successful, the investment bankers take the lead in securing the feasibility studies and other necessary preliminaries, at their own expense, and, in effect, lead the cities by the hand up to the point of the issuance of the bonds, which are underwritten or "bought" by the investment bankers. The investment bankers, such as defendant, then sell the bonds which

they have underwritten or bought and make their profits out of the difference between the price they pay the city for the bonds and the price at which they are able to sell such bonds to the investors. When the banker, or more specifically his buyer, has created an interest in the city, an underwriting agreement is signed by the banker and the city officials. This contract is normally binding for three years and provides that the underwriter (the banker) will secure an engineering study to determine the feasibility of the proposed project. If the engineering study reveals that there is a likelihood of being able to secure a gas supply and that there would probably be a sufficient volume of customers to produce enough revenue to make the venture economically sound, then an election is held to authorize the city to issue the revenue bonds. If the bond issue carries, then a commitment to underwrite or purchase the bonds, in the form of a contract, is signed by the city and the underwriter; then application is made to the Federal Power Commission for an allocation of a gas supply from sources in interstate commerce and if such allocation is secured, then the actual contract to buy the bonds is signed, the bonds are issued and purchased by the underwriter. If at any step in this process the city determines, for any reason, not to go forward with the project, it can back out without obligation and the expenses of the engineering survey and other preliminaries are borne by the underwriter. The evidence indicates that about ninety per cent of the projects which are initially investigated by the underwriters fall through at some step before the actual issuance of the bonds.

These companies employ men known as "buyers" to interest the cities in the project and to carry the project through until it culminates in the bond issue. They also employ men known as "sellers" who sell the bonds primarily to institutional investors rather than the general public. The buyers are also interested in the sale of the bonds they buy and will do whatever they can to assist in the sale of such bonds. The buyers primarily travel around to the cities to drum up interest in such projects, whereas the sellers primarily stay in the office and attempt to make sales over the telephone, although they do travel to make personal contacts with the investors.

This case involves five bond issues for natural gas distribution systems in the cities of Madison, Perry, Paris, Monroe City and Grant City, all in the State of Missouri.

Late in May of 1960 the plaintiff Roy Miller contacted Jack Ranson, who was vice president of the defendant, and whose father was president of the defendant company, and asked for a job. He had previous experience in buying municipal bonds in the type of business heretofore described. This resulted in a meeting between Jack Ranson and the plaintiff wherein plaintiff was hired by defendant, primarily as a salesman, although in view of his past experience as a buyer, he was given a small territory of seventeen counties in northwest Missouri and some counties in northeast Kansas, in which he was authorized to buy. The terms of his compensation are disputed. He was to receive a salary of $400.00 a month. Plaintiff says this was a salary pure and simple and had no effect upon the payment of commissions. Jack Ranson, who was the only witness for the defendant, and with whom plaintiff had all his contacts with defendant, testified that plaintiff was to be compensated by commission only, but that he was given "a guarantee" or "guaranteed salary" of $400.00 a month. In addition to this $400.00, both parties agree that plaintiff received $100.00 a month as a drawing account. In addition to the $400.00 salary and $100.00 drawing account per month, plaintiff was to receive commissions on all bonds that he sold according to a specified schedule, which varied according to the maturity and other details of the bonds sold. This commission was paid or credited to plaintiff at the time of the sale and delivery of the bonds sold. Plaintiff was also to receive a commission of 10% of the net profit of defendant on any bonds which plaintiff bought. Both plaintiff and de-

fendant agree as to the amount of the commission on sales and the commission on bonds bought, although there is some minor dispute as to the exact meaning of "10% of the net profit". Defendant claims that all of the commissions, both buying and selling commissions, were to be applied first to pay back the $100.00 drawing account and then to pay back the $400.00 guaranteed salary, and only if plaintiff earned commissions over and above this $500.00 per month ($400.00 salary plus $100.00 drawing account) was plaintiff to be paid any commissions. Plaintiff admits that his commissions were to be applied to the drawing account, but denies that commissions were to be applied against the salary account. He testified that all buyers receive a salary plus their buyers' commission and that the $400.00 was a salary, and was not to be offset against his commissions.

Defendant's counterclaim was for the balance due on the $100.00 drawing account plus $175.00 advanced to plaintiff for traveling expense not paid back. Plaintiff admitted he owed the amount of the counterclaim. Verdict of such agreed amount was directed by the court and it is not in issue here.

Jack Ranson also testified that it was specifically agreed between him and plaintiff, at the time of plaintiff's employment, that no buying commission would be paid to plaintiff after he left defendant's employ, on any bond issue bought by plaintiff which was not finally concluded before plaintiff left defendant's employ. He stated this was an unusual agreement. Plaintiff denies any such agreement and specifically testified that there was no discussion whatever of what would happen if and when he left the company.

In the fall of 1960, exact date uncertain, but within a few months after plaintiff started to work for defendant, there was a luncheon meeting attended by plaintiff, Jack Ranson for defendant, and John Willhauck, vice president of Luce-Thompson and Company, investment bankers operating in the municipal bond field, at the Phillips Hotel in Kansas City, Missouri. It seems that defendant and Luce-Thompson had cooperated in underwriting municipal bonds in the past; plaintiff had previously been employed by Luce-Thompson and was a personal and business friend of John Willhauck. At this meeting plaintiff and Willhauck proposed to Jack Ranson that plaintiff be permitted to buy municipal bonds throughout the State of Missouri, and that he and Willhauck travel together to initiate these projects and to "buy" the bonds. Jack Ranson agreed to this and plaintiff and Willhauck did travel together. They contacted the city officials of the above five named Missouri cities, among many others, and were both present and one or both signed the underwriting agreements with each of these five cities on behalf of both defendant and Luce-Thompson as to Madison, Perry and Paris, and on behalf of these two investment bankers plus a third investment banker in the instances of Monroe City and Grant City.

Where two or more investment bankers underwrite one bond issue, one company takes the lead and acts as the "underwriters' underwriter" or "manager" and does the detailed work in following the project to conclusion. In each of these instances, John Willhauck for Luce-Thompson and Company acted as the underwriters' underwriter or manager and did 90 to 95% of the work on each of these five projects. His company was given a manager's fee plus an additional percentage of the profits to compensate for this work.

There was testimony that the initial contract with the city, called the "underwriting agreement", although it contained many contingencies on which the project could be discontinued by the city without obligation, is a firm contract which extends for three years, with the possibility of a further extension, and obligates the city to retain the bankers as underwriters of the bond issue, if the project is continued. The form of the contract is dictated by the limited nature of the authority of the city officials

to bind the cities in such matters. All of these contracts were signed in the month of March, 1961. Thereafter, plaintiff cooperated with Willhauck and consulted with him in the necessary work as the projects went along and specifically in securing the withdrawal of the first engineer, who concluded that the projects were not feasible, and in securing a substitute engineer on the basis of whose reports the projects were brought to a conclusion.

Plaintiff left defendant's employ on January 31, 1962. Thus he was in the employ of defendant 20 months. At the time plaintiff quit none of these five bond issues had been completely sold and the underwriting completed, and therefore plaintiff made no claim for this commission. He testified that after he left the company, defendant's auditor, on either two or three occasions, wrote him letters stating that he owed the company $959.90, as the balance due on his drawing account plus unreimbursed travel expenses and that shortly after the first such letter Jack Ranson wrote him a letter in which he stated, "Roy, you owe us so and so and I told Dad that you had more than this coming in commissions". Plaintiff stated that he destroyed the letter but that there should be a copy in defendant's files. No such copy was produced. All three of the witnesses, Willhauck, plaintiff and Jack Ranson testified that the contracts with these five cities were "buying" contracts or "buys" and both plaintiff and defendant agreed that plaintiff was to receive a commission of 10% on buys. It appears from settlement sheets in evidence that defendant's share of the profit of the joint underwriting account on these five bonds totaled $88,635.35.

Defendant contends that it was agreed between Jack Ranson and plaintiff that plaintiff would not receive buying commissions after he left defendant's employ but such buying commissions would stay with the company after he left. Plaintiff denied any such agreement. Defendant also contends that any and all commissions, whether on buying or selling, were to be applied against the drawing account, and the $400.00 a month guarantee or guaranteed salary, and that in the twenty months of plaintiff's employment he received a total of over $10,-000.00 from the company; that even if plaintiff was entitled to his 10% commission on the $88,000.00 profit made by defendant on these five bond issues, his total commissions (both buying and selling) amounted to less than he had been paid and plaintiff would have nothing coming. As heretofore stated, plaintiff admitted the setoff arrangement on the $100.00 a month drawing account but denied that his commissions were to be applied against the $400.00 a month salary.

Defendant in its brief contends that the trial court erred in failing to direct a verdict for defendant and in giving instructions 2 and 3. None of the points in appellant's brief conform to the requirements of Civil Rule 83.05, V.A.M.R. because they do not specify "why it is contended that the court was wrong". Under point one of the brief defendant cites two cases for the proposition that "the burden of proof rests on the party having the affirmative of the issue and this is applicable to actions on contracts" and that "a pleader seeking affirmative relief * * * must produce evidence to support his claim". Other than that, no authorities are cited in the brief. We will, however, do our best to consider such contentions as we can discover in the brief. Defendant first contends that a verdict should have been directed for defendant because plaintiff failed to plead a claim for relief and because he failed to prove a claim for relief. We will assume that this raises a question as to the sufficiency of the petition to state a cause of action and the sufficiency of the evidence to support the verdict of the jury. From a reading of the argument contained in the brief, it seems to be defendant's contention that the petition is insufficient because it does not specifically plead the conclusion that plaintiff was entitled to his buyer's commission

after he had left defendant's employment. We do not need to determine the sufficiency of the petition because this was the issue upon which both parties tried the case; they both adduced evidence on this issue and submitted it to the jury by the instructions. The parties stipulated to the admission of the settlement sheets showing the profit of defendant on each of the five bond issues, which were concluded after plaintiff left defendant's employment. Most of the testimony of plaintiff and Jack Ranson for defendant went to this issue. Thus, even if we were to assume that the petition was insufficient, it would appear that the parties have, without objection, tried and submitted this issue and after judgment we will treat the petition as if it had been amended to conform to the proof and the theory upon which the case was tried. The evidence on this issue came in without objection and defendant can not now complain. See Harris v. Goggins, Mo., 374 S.W.2d 6; Evett v. Corbin, Mo., 305 S.W.2d 469. We therefore conclude that the trial court did not err in refusing to direct a verdict because of defects in the petition.

As to the sufficiency of the evidence to support the judgment, we must, on this appeal, view such evidence in the light most favorable to the plaintiff together with all reasonable inferences in his favor which may be drawn therefrom, and we must disregard defendant's evidence except as it may help plaintiff. The evidence was conflicting and under such circumstances it was the function of the jury to resolve such conflict by deciding which witness to believe. This the jury has done and we will not disturb their verdict if it is supported by substantial evidence. We have heretofore set forth the evidence in some detail. From this the jury would be justified in finding that plaintiff was employed on the basis of a salary of $400.00 a month plus a drawing account of $100.00 a month; that plaintiff was to receive certain commissions on sales that he made and a commission of 10% of defendant's net profits on bonds that he bought; that such commissions were to be set off only against the $100.00 drawing account and not against the $400.00 a month salary, and that plaintiff earned the buying commission when he initiated the projects and "bought" the bonds by the signing of the underwriting agreements. The jury could further find that there was no agreement to leave the buying commission with the company when plaintiff quit, but that he became entitled to such buying commission at the time of the signing of the underwriting agreement and that the payment was only deferred until the transaction was completed and the net profit could be ascertained. The jury could further find that having earned the commission, he did not lose it when he left the company; that defendant made a profit in excess of $88,000.00 on the five bond issues in question and that plaintiff was entitled to his buying commission of 10% of this amount. This would support the verdict for plaintiff in the sum of $8,800.00.

Defendant next complains that the trial court erred in giving instruction No. 2 because it "is too general and speculative and did not advise or guide the jury in the method or subject of its decision". The instruction is modeled on MAI although no instruction applicable to this contract case is contained in MAI. It required the jury to find an employment contract between the parties, which plaintiff performed and which defendant failed to perform, which failure resulted in plaintiff not receiving commissions due him. Defendant complains that this instruction did not require the jury to find that plaintiff was entitled to his buying commissions after plaintiff left the employment of defendant. Defendant contends that the instruction allows the jury to speculate and permits the jury to rely upon their individual knowledge in reaching their verdict.

We do not hold this instruction out as a model to be followed in the future, but, even if we assume that, standing alone, it is defective, we must consider it together with the other instructions in the case. The

court gave, at defendant's request, instruction No. 4, which read, "Your verdict must be for defendant on plaintiff's claim * * * if you believe that by the terms of plaintiff's employment agreement with defendant plaintiff was not to be paid any commissions on buying transactions which were concluded after plaintiff left the employ of defendant". The court also gave instruction No. 5 for defendant which read, "Your verdict must be for defendant on plaintiff's claim * * * if you believe: First, that by the terms of plaintiff's employment agreement with defendant, plaintiff was to be credited with commissions on buying transactions which were concluded after plaintiff left the employ of defendant, and, Second, that also by the terms of said agreement with defendant, such commissions would be applied against plaintiff's drawing account and guaranteed salary paid to him, and Third, that all of plaintiff's selling and buying commission credits did not exceed the total amount of plaintiff's drawing account and guaranteed salary paid to him".

■ It is basic that these instructions must all be read together, and that if when read together, they completely instruct the jury, are not confusing and do not permit the jury to arrive at its verdict through speculation or conjecture, then such instructions are proper even though one of such instructions, standing alone, may be defective. This is plainly set out in Venditti v. St. Louis Public Service Co., 362 Mo. 339, 240 S.W.2d 921, 1.c. 926, where the court stated: "It was said by this court in Jenkins v. Missouri State Life Ins. Co., 334 Mo. 941, 947, 69 S.W.2d 666, 669: 'However, all instructions must be read and construed together, and where, taken together, they do contain a complete exposition of the law and cover every phase of the case, a verdict obtained thereon will be sustained, although some of the instructions taken separately may be incomplete and open to criticism.'" See also Higgins v. Terminal Railroad Association of St. Louis, 362 Mo. 264, 241 S.W.2d 380; Perry v. Stockhoff Supply Co., Mo., 356 S.W.2d 92 and Terry v. Boss Hotels, Inc., Mo., 376 S.W.2d 239.

■ In the present case defendant's instructions No. 4 and 5 direct a verdict for defendant if the jury found either one of defendant's contentions to be true. Thus even if plaintiff's instruction No. 2 was defective, as claimed, such defect was remedied by No. 4 and 5, and when all the instructions were read together, the jury was completely instructed on all the issues in the case, was not left to its own devices or permitted to resort to speculation or conjecture in arriving at its verdict, and was in no manner confused. We therefore conclude that the trial court did not err in giving instruction No. 2.

■ Lastly, defendant contends that the trial court erred in giving instruction No. 3 (the damage instruction) because "said instruction is too general and speculative in advising the jury it must award the plaintiff such sum it believes will fairly and justly compensate plaintiff". The instruction reads as follows: "If you find the issues in favor of the plaintiff, then you must award the plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any commissions which you believe due him from defendant".

■ While this instruction is not taken from MAI because no applicable instruction is found therein, it will be noted that it is a very close paraphrase of MAI Instruction No. 4.01. Defendant contends that the instruction should have been more specific, because the amount of commissions claimed was capable of a mathematically certain computation. It appears to be defendant's contention that because a specific amount or limit was not contained in the instruction that such instruction allowed the jury a roving authority to arrive at its verdict through speculation. We can not agree. We believe that under Civil Rule 70.01 the instruction is proper. In any event, it does not constitute a misdirection. The only fault claimed is that it is too gen-

eral. In such circumstances, the defendant can not complain of the instruction given, but if he believed a more specific instruction was desirable, it was his duty to submit such an instruction. In the absence of such a submission by defendant, there is no error. See Hay v. Ham, Mo.App., 364 S.W.2d 118 and Samuels v. Illinois Fire Ins. Co., Mo.App., 354 S.W.2d 352. In this case defendant did not submit a more specific damage instruction, and, therefore, can not complain of the instruction given, which is correct, although it is general.

Finding no error in the trial of this cause, the judgment below is affirmed.

BLAIR, J., concurs.

CROSS, P. J., not participating.