Rhonda McGINNIS, Respondent,

v.

NORTHLAND READY MIX,
INC., Appellant.

No. WD 71317.

Missouri Court of Appeals,
Western District.

May 24, 2011.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 5, 2011.

Application for Transfer
Denied Aug. 30, 2011.

Mark Edward Kelly and Kristi Lanae Pittman, Liberty, MO, for appellant.

James Charles Wirken, Kansas City, MO, for respondent.

Before Division One: THOMAS E. NEWTON, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

Northland Ready–Mix, Inc. ("NRM") appeals following a jury trial on claims of temporary nuisance which resulted in a judgment for damages in favor of the Respondent, Rhonda McGinnis. NRM contends the trial court erred in failing to grant its motion for directed verdict or judgment notwithstanding the verdict because McGinnis failed to prove the elements of her claim for temporary nuisance. In addition, NRM claims the court erred by allowing the jury to consider appraiser Robin Marx's testimony without a proper foundation and allowing McGinnis's trial counsel's "send a message" argument in closing. We affirm.

### Statement of Facts

NRM is a family-owned and operated cement mixing plant located in Pleasant Valley, Missouri. NRM was started in 1975 by Myrtle Halley and her husband as a u-cart cement business. The u-cart business allowed customers to come and pick up carts filled with a yard of concrete to take home for personal use. NRM also had trailers that could be filled with 5,000 pounds of concrete for customers to take home. In 1986, the Halleys expanded their business, purchasing their first cement truck, and began converting the u-cart business into a cement mixing plant. NRM also purchased additional adjacent property to allocate for the expansion. By 1991, NRM had grown to include additional parking, three concrete trucks and a silo. NRM's business continued to gradually expand, and by 2009 NRM owned eight trucks and had seven to eight employees.

McGinnis owns two parcels of land which abut NRM's property. In 1985, she purchased the property located at 8603 Schell Road ("Schell Road property"), directly west of NRM and zoned residential. McGinnis briefly lived in this property before using it as a rental property. She then became the legal owner of property located at 6410 N.E. 69 Highway ("69 Highway property"), in 1988, after purchasing that property from her parents. It is located directly south of NRM and zoned "light industrial." McGinnis owns

and operates a cabinet-making business on the 69 Highway property and also uses this property as a residential duplex.[1]

To accommodate for the expansion and change to a cement mixing plant, NRM made several changes to its property beginning in the late 1980s. NRM placed a fence around the property, constructed a concrete wall on two sides of the property, and a twelve-inch curb was placed around the parking lot to prevent water from running over the side. A "washout" pit was constructed in the southeast corner of the property to be used when washing out the tumblers on the concrete trucks, and a "sediment" or "slag"[2] pit also was placed on the southwest corner of the property to collect rainwater containing concrete particulates. A chute was also placed in the northwest corner of NRM's property which drained water into a culvert that ran under McGinnis's driveway and into the creek behind her property.

The washout pit was constructed to catch any water runoff from the cleaning of the trucks, including any rock, sand, or sludge. Supposedly, NRM monitored the water from the washout pit and hauled the water off when the pit filled or prior to rain to prevent overflow problems. The slag pit, on the other hand, was designed to catch any water runoff and sediment that may flow downhill from the concrete plant before being discharged into the creek on McGinnis's property. Particulates in the water were supposed to settle in the pit and the remaining water would run out of an upper pipe, presumably containing less slag, to the creek.

The upper pipe originally ran underground across McGinnis's property to drain the water into the creek. However, McGinnis sealed the pipe on two separate occasions after indicating to NRM that she had not given permission for the pipe and no longer wanted NRM dumping its runoff onto her property. Because the drain pipe was blocked, the water collected in the slag pit began to overflow out the top of the pit. As a result, NRM was required to use a water pump to pump the water from the sediment pit back up into the washout pit. Despite NRM's claims that it carefully monitored both the washout and slag pits, and that both were drained when necessary to prevent any type of overflow, McGinnis experienced several occasions of water overflow onto her property, beginning in 1994 and continuing through the 2009 trial, which was confirmed by McGinnis's tenants and employees.

According to McGinnis and her tenants, water containing sand, gravel, and cement overflowed from NRM's pits onto her property which dampened it, prevented her from using a lawn mower or driving a car onto the property, and caused the ground to sink when anyone attempted to walk on it. In addition, sediment collected outside her property on the driveway and in other areas. Because of the amount of sediment, sand, and dirt that was tracked into her property as a result, she also had to have her carpets cleaned at both properties on multiple occasions. Furthermore, McGinnis claimed she lost tenants, and subsequent rent, due to the water and sediment problems.

As a result of McGinnis's perceived problems, she filed a petition for damages against NRM for one count of nuisance and one count of trespassing on June 9, 2004. McGinnis then filed an amended

---

1. The use of the property as a residential duplex was grandfathered in when the zoning designation changed to light industrial prior to McGinnis's purchasing of the property.

2. "Slag" was defined by Laura Zychowski, an inspector with the Kansas City Regional Office of the Department of Natural Resources, as "left over non-usable product" from cement production.

petition on April 10, 2008, restructuring her claims to include Count I for nuisance due to water overflow, Count II for nuisance due to dust and noise, and Count III for trespass.

After a five-day jury trial, the jury awarded damages of $50,000 to McGinnis on her claim for temporary nuisance due to water overflow. The jury found in favor of NRM on claims of temporary nuisance due to dust and noise, and the judge granted NRM's Motion for Directed Verdict on McGinnis's claim for trespass. NRM filed a Motion for Judgment Notwithstanding the Verdict or in the Alternative, Motion for New Trial on Count I or Remittitur, which was denied by the trial court. NRM now appeals.

### Point One

In Point One, NRM argues that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict ("JNOV"), because McGinnis failed to prove the elements of her claim for temporary nuisance. Specifically, she failed to show that NRM's use of its property was unreasonable given the zoning, location, character of the neighborhood, and nature of use. In addition, NRM contends that McGinnis did not submit evidence showing the water that ran on to her property was caused by it.

■■■■ "We review the trial court's denial of motions for directed verdict and JNOV *de novo* to determine whether the plaintiff has made a submissible case." *U.S. Neurosurgical, Inc. v. Midwest Div.-RMC, LLC,* 303 S.W.3d 660, 664 (Mo.App. 2010). "To make a submissible case, a plaintiff must present substantial evidence that tends to prove the facts essential to plaintiff's recovery." *Id.*; *see Lasky v.*

*Union Elec. Co.,* 936 S.W.2d 797, 801 (Mo. banc 1997). Substantial evidence is evidence which, if true, has probative force upon the issues, and from which the jury can decide the case. *Hayes v. Price,* 313 S.W.3d 645, 650 (Mo. banc 2010).

■■■■ When determining whether the evidence was sufficient to support the jury's verdict, "the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Dhyne v. State Farm Fire & Cas. Co.,* 188 S.W.3d 454, 456–57 (Mo. banc 2006). "[W]e will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion." *Id.* at 457. Thus, "[a] directed verdict is inappropriate unless reasonable minds could *only* find in favor of the defendants." *Guidry v. Charter Commc'ns, Inc.,* 269 S.W.3d 520, 527 (Mo. App.2008).

■■■■ Nuisance requires an interference with the use and enjoyment of land. *See Williams v. Monsanto Corp.,* 856 S.W.2d 338, 340 (Mo.App.1993). To prove a nuisance,[3] a plaintiff must show that the defendant unreasonably uses his or her property such that it substantially impairs the plaintiff's right to peacefully use his or her property. *Id.* at 341. "Whether a use is unreasonable to the point of a nuisance depends on factors such as the locality, character of the neighborhood, nature of use, extent of injury, and effect upon enjoyment of life." *Id.* Nuisance law recognizes the inherent conflict between the rights of neighboring property owners, and the unreasonable use element seeks to bal-

---

**3.** The nuisance here was considered a temporary nuisance, not a permanent one, by all parties involved, because the overflow of the drainage could be abated. *See Peters v. Conti-*

*Group,* 292 S.W.3d 380, 385 (Mo.App.2009) ("A nuisance is temporary if it may be abated, and it is permanent if abatement is impracticable or impossible."). See Point Two below.

ance those rights. *Peters v. ContiGroup,* 292 S.W.3d 380, 385 (Mo.App.2009).

The jury found for the Plaintiff based on Instruction No. 8, which stated as follows:

Your verdict must be for plaintiff if you believe:

First, plaintiff used her property for a rental property, a residence and the operation of a cabinet making business, and

Second, defendant operated a concrete making plant operation in close proximity to plaintiff's rental property, residence, and cabinet making business, and

Third, the defendant allowed water containing cement, and/or sand, and/or gravel, and/or cement sludge to escape from defendant's premises onto the plaintiff's property and this substantially interfered with and impaired the plaintiff's use and right of enjoyment of her property, and

Fourth, such use by defendant of its property was unreasonable, unless you believe that plaintiff is not entitled to recover by reason of Instruction No. 9.

This was followed by Instruction No. 10, which stated:

Whether a use is unreasonable depends upon factors such as the locality, character of the neighborhood, nature of use, extent of injury, and effect upon enjoyment of life.

A resident of an area zoned light industrial cannot expect the same relative freedom as that enjoyed by those in residential districts. The second paragraph of this Instruction No. 10 applies to Plaintiff's property located at 6410 69 Highway location only.

■ As NRM points out, the crux of a nuisance case is unreasonable land use. To reach a verdict in favor of McGinnis, the jurors had to determine that water containing cement was allowed to flow from NRM's property on to hers and that this was unreasonable. Jury Instructions Numbers 8 and 10 fully apprised the jurors of the factors they were to consider in determining whether NRM's use of its property was unreasonable, including zoning, and NRM has not offered any reason to believe the jurors did not consider these factors when they determined that the use of the property was unreasonable.

Several witnesses, including McGinnis, testified that water from NRM's property, which contained sediment, composed of sand, gravel, concrete, and other particulate matter, was allowed to overflow onto McGinnis's property causing her property to erode, become saturated, and become difficult to use. Ben Ludwig, a previous long-term tenant, cited numerous occasions where NRM's sand would flow onto the property, clogging up the culvert, and cause "soupy" water and debris to flow onto the grass. Further, McGinnis's longtime employee of fourteen years, Paul Fenton, said NRM's pit would overflow with sediment-laden water at all times of the year, including during the hot dry parts of the summer, causing McGinnis's property to become a "swamp."

While Patrick Peltz, an employee with the Water Control Division of the Department of Natural Resources ("DNR"), testified he inspected NRM's plant to determine compliance with state requirements for a water discharge permit and found the plant was a "well run and clean plant," he inspected the premises only once, June 19, 2008, and never during a period when the slag pit could have overflowed due to heavy rains or washing. In addition, Laura Zychowski, an inspector with the Kansas City Regional Office of the DNR, had conducted an inspection of NRM's property on June 25, 2003, citing numerous violations of the Missouri Clean Water Law, Missouri Clean Water Commission regulations, and the facility's Missouri State Operating Permit ("MSOP"), including storm

water effluent discharge with levels of cement exceeding permitted limits. Zychowski specifically determined the washout pit used to collect rainwater during runoff and some wash water runoff was overflowing and should be pumped and drained, and the slag drying pit needed to be emptied as it was full enough that if a rainstorm happened, the sediment would overflow into the cement gutter and into the stream on McGinnis's property. Zychowski then conducted a follow up inspection on September 11, 2003. While the washout pit appeared to be pumped down, the slag drying pit was still near full capacity. Thus, NRM was still not in full compliance.

The type of zoning for the 69 Highway property, light industrial, is not contested by the parties. NRM contends McGinnis knew the 69 Highway property was located in an area zoned for light industrial, which allows for concrete mixing plants like NRM's and the "reasonable" nuisances associated with them, when she bought the property and began using it as both a cabinetmaking business and a residential duplex. Thus, she was aware the duplex was located immediately adjacent to NRM's cement mixing plant and should have expected the run-off.

■ NRM also contends that *Fuchs v. Curran Carbonizing & Engineering Co.*, 279 S.W.2d 211 (Mo.App.1955), is controlling on the issue of reasonable expectations in zoning in this case. We disagree. While residents in an area zoned light industrial cannot expect the same relative freedoms as those in residential districts, this does not mean they are devoid of all freedom to use and enjoy their property. *See Fuchs*, 279 S.W.2d at 218. In *Fuchs*, the trial jury returned a verdict in favor of the property owner challenging an industrial nuisance from a coal-testing laboratory. *Id.* at 213–14. The court set this verdict aside, because the first instruction to the jury was found to be confusing and misleading as it failed to instruct the jury on the required factors to be utilized in determining whether the industrial operator's acts were a nuisance, which should have included zoning. *Id.* at 216–19. The first instruction was classified as an error because it omitted any reference to the operator's legal rights to operate a laboratory in determining whether an unreasonable interference existed against the owner's use of his property. *Id.* at 219. The court stated the operator's business was lawful for the zoning and could emit gases and odors within "reasonable bounds" before being declared a nuisance. *Id.* However, the trial court failed to instruct the jury as to this and committed reversible error. *Id.*

Here, no such issue exists with whether the jury was instructed to take the zoning type into consideration when determining whether NRM's use of its property was reasonable. The jury instructions were clear in this case, as deference to the type of zoning was explicitly included. Also, the jury was consistently reminded during the testimony of McGinnis, Peltz, and Marx that the area was zoned for light industrial. In addition, Zychowski's reports gave the jury credible evidence that NRM was not following the reasonable guidelines for effluent discharge required for concrete mixing plants under its MSOP, regardless of the zoning, and NRM was allowing sediment-laden water to overflow onto McGinnis's property. Thus, *Fuchs* is not instructive in this case.

Viewing the evidence in the light most favorable to the verdict, we find that there was evidence to support submission of the claim that water from NRM's property, containing concrete slag, was allowed to overflow onto McGinnis's property, and that this use of NRM's property was unreasonable given the locality, character of the neighborhood, nature of use, extent of

injury, and effect upon McGinnis's enjoyment of life. NRM's first point is denied.

### Point Two

In Point Two, NRM argues the trial court erred in denying its motions for directed verdict and JNOV because McGinnis failed to prove she suffered any damages as a result of water running off of NRM's property. Specifically, NRM contends McGinnis submitted no evidence of the actual monetary damages she sustained and stated only that she lost money from rent due to the nuisance.

The standard of review for a denial of a directed verdict and JNOV is outlined above for Point One and is incorporated here by reference.

A nuisance can be temporary or permanent. *Cook v. DeSoto Fuels, Inc.,* 169 S.W.3d 94, 106 (Mo.App.2005). "A nuisance is temporary if it may be abated, and it is permanent if abatement is impracticable or impossible." *Peters,* 292 S.W.3d at 385. If a nuisance is found to be temporary, the defendant is legally obligated to terminate the injury. *Cook,* 169 S.W.3d at 107. Each day it continues is "considered a repetition of the original wrong, and successive actions accrue as to each injury[.]" *Id.* Whether a nuisance is classified as temporary or permanent determines the proper measure of damages. *Peters,* 292 S.W.3d at 385. Here, McGinnis did not plead permanent nuisance; she proceeded on a theory of temporary nuisance against NRM, as the overflow from the washout and slag pits could have been abated.

The measure of damages for temporary nuisance is the decrease in the property's rental or useful value while the nuisance exists and incidents of damage, including, for example, loss of comfort and health. *Peters,* 292 S.W.3d at 385; *see also Frank v. Envtl. Sanitation Mgmt., Inc.,* 687 S.W.2d 876, 883 (Mo. banc 1985)

("[D]amages for temporary nuisances include the *decrease in rental or useable value* of property during the injury." (emphasis added)). The recovery is limited to "the damage actually sustained to the commencement of the suit, but not for prospective injury." *Stevinson v. Deffenbaugh Indus., Inc.,* 870 S.W.2d 851, 855 (Mo.App.1993). Compensatory damages can also be granted for inconvenience and discomfort caused by the nuisance. *Byrom v. Little Blue Valley Sewer Dist.,* 16 S.W.3d 573, 576 (Mo. banc 2000); *Brown v. Cedar Creek Rod & Gun Club,* 298 S.W.3d 14, 21 (Mo.App.2009). "In computing compensatory damages, there is no precise formula or bright line test to determine non-economic losses. Each case must be considered on its own facts, with the ultimate test being whether the award fairly and reasonably compensates the plaintiff for the injuries sustained." *Brown,* 298 S.W.3d at 21.

NRM contends the court erred in allowing McGinnis's expert appraiser, Robin Marx, to testify regarding the reduction in the "market value" of rent obtainable for each of McGinnis's properties during the period of the nuisance because market value is the proper measure of damages for permanent nuisance, not temporary. *See Peters,* 292 S.W.3d at 385 ("Damages for a permanent nuisance are measured by the change in the property's fair market value as a result of the injury."). NRM relies on *Stevinson v. Deffenbaugh Industries, Inc.,* for the proposition that Missouri courts will reverse jury verdicts when claimants have proved and submitted damages for permanent nuisance in temporary nuisance cases. 870 S.W.2d at 856. We do not entirely agree with NRM's characterization of *Stevinson.* In any event, however, NRM wrongly interprets the loss of "market value" rents *during the period of the nuisance,* to which Marx testified in this case, as amounting to mar-

ket value determinations for permanent damages.

*Stevinson* is distinguishable from the case at hand. In *Stevinson,* the plaintiffs sought, and the jury awarded, damages to compensate for the stigma attached to their properties, which rendered the properties permanently devalued as a result of the unreasonable operation of a landfill. *Id.* at 855. The court reversed the jury's award of permanent damages explaining:

> In an action for damages in what was pleaded and presented in the case at bar as a temporary nuisance, it was error for the trial court to allow evidence and instruct the jury on reduction in fair market value. Reduction in fair market value constitutes permanent damages which are not recoverable for a temporary nuisance. Accordingly, this cause is remanded for new trial.

*Id.* at 856. The jury in that case had been allowed to consider the amount that the plaintiffs' properties' total market value had been "permanently devalued" as a result of the nuisance, which essentially allowed the jury to compensate for "prospective" injury to the plaintiffs. Not only was the improper evidence admitted, but the jury instruction allowed the jury to consider such injury in the amount awarded. *Id.* The submission in that case was not limited to the retrospective reduction in rental value up until the time of the suit as required. *Id.* at 855–56. This was a clear step into the evaluation of permanent damages by the jury where only a temporary nuisance was presented.

Here, Marx's testimony to the jury was limited to the amount of market value reduction in *rental value* of McGinnis's properties through the time of trial, consistent with the standard for temporary nuisance damages. He testified that because of the nuisance created by NRM, the rental value of McGinnis's Schell Road property suffered a total lost rental value of $42,720,[4] and the 69 Highway property had a total lost rental value of $50,033,[5] based on the "market's perception" of what fair rental value would have been. Marx did not take into account any future losses and based his calculations off of comparable properties, and, to accommodate for rent fluctuations, Marx averaged rent figures based on the averages for the past fifteen years of what the rent would have been. Because Marx's valuations only took into account the nuisance's effect on the *decrease in rental or useable value* of McGinnis's properties, and not a permanent market devaluation in the property as a whole, *Stevinson* is distinguishable and not controlling.

█ NRM also argues McGinnis failed to show actual damage because Marx testified only as to market-based damages and did not take into account McGinnis's lack of demonstrable rental losses suffered during the 178–month duration of the nuisance. While damage is one element required for a claim of nuisance, *see Christ v. Metropolitan St. Louis Sewer District,* 287 S.W.3d 709, 711–12 (Mo.App.2009), NRM cites no authority that in order to determine damage for a temporary nuisance, the market-based rental loss must be offset by the actual rental loss shown to have been suffered by the owner claiming nuisance; and we find none. In fact, to prove damage from a temporary nuisance requires only a showing of "the depreciation of the rental or usable value [of the property] during the continuance of the injury." *Bollinger v. Am. Asphalt Roof Corp.,* 224 Mo.App. 98, 19 S.W.2d 544, 549 (1929). To

---

4. This figure is based on a lost rental value of $240 per month, for the prior period of 178 months, the total number of months prior to the submission of the claim.

5. This figure is based on a lost rental value of $3,373 per year, for the prior period of 178 months.

hold otherwise would prevent an owner who was occupying his own property encumbered by a temporary nuisance from ever proving damage because there is technically no rental loss, an absurd result. The jury could reasonably have believed Marx's testimony that McGinnis's property suffered a market-based rental loss, even though she had tenants [6] during a majority of the 178 months of the nuisance, demonstrating damage to McGinnis.

In any event, in a temporary nuisance case, not all damages need be financial in character. McGinnis could be awarded compensatory damages for discomfort and inconvenience caused by the nuisance. *See Byrom,* 16 S.W.3d at 576. McGinnis testified that she had to deal with a constantly saturated and muddy backyard and was forced to clean up the sand, sediment, and other debris washed onto her property from NRM's concrete plant. It was within the province of the jury to consider McGinnis's testimony and award any appropriate damages.

The jury awarded McGinnis a $50,000 verdict. The jury was not required to explain its calculation of damages in this case, and we cannot determine how the jury decided on its verdict. Nor can we or anyone else decide how much, if any, was to compensate McGinnis for inconvenience and discomfort or decrease in rental value. This court gives great deference to a jury's decision regarding the appropriate amount of damages, as they are in the best position to make such a determination. *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 872 (Mo. banc 1993). Here, McGinnis presented evidence suggesting damages of more than $178,000, and the jury awarded $50,000. Sufficient evidence was presented to support an award of $50,000. Point Two is denied.

## Point Three

In Point Three, NRM contends the testimony from Marx, McGinnis's expert, should have been stricken by the trial court because Marx failed to inspect the sales he relied upon, and therefore his testimony lacked proper foundation, and he did not offer any opinions as to actual damages.

NRM moved to strike Marx's testimony before he testified, stating that it anticipated Marx would be testifying to future loss of rents, which would not be the appropriate measure of damages in a temporary nuisance case. NRM also suggested no foundation existed for Marx to determine whether the nuisance was abatable by McGinnis or NRM, but quickly said "that's not the issue" and continued to challenge Marx's testimony for future damages. McGinnis conceded Marx would not testify to future damages, and the trial court subsequently denied NRM's motion, cautioning McGinnis's attorney to avoid any questions or talk of future damages. At no time did NRM raise any concern of a lack of proper foundation for Marx's proposed testimony regarding lost rental value. Specifically, NRM did not raise issue with Marx's alleged failure to confirm the rents upon which he relied to estimate damages or failure to inspect the properties of rents upon which he relied, which it does now.

Then, instead of making an objection on the record while Marx was testifying, NRM waited until after the direct, cross, and redirect examinations of Marx had already been completed and Marx had been excused and left the witness stand. NRM then moved to strike Marx's entire testimony, claiming it did not set forth the proper measure of damages because Marx did not use "proper methodology" for re-

---

**6.** Testimony revealed that the tenants of McGinnis's properties were typically friends and family. Marx testified that friends and family will usually "tolerate [problems with property] that the open market would not."

viewing comparable properties. The trial court denied the motion.

■■■ There was no contemporaneous and timely objection. Because NRM did not timely object to alleged lack of foundation of Marx's testimony, its claim has been waived. "[F]ailure to object at the earliest opportunity to the admission of evidence or argument of counsel constitutes a waiver of the claim." *State v. Barnett*, 980 S.W.2d 297, 304 (Mo. banc 1998). Requiring timely objection to error in the admission of expert testimony affords the trial court the opportunity to invoke remedial measures or take corrective action to resolve error rather than relegating appellate courts to determine whether prejudice resulted. *Id.* at 304–05. Here, the objection could have, and should have, been made during Marx's testimony, giving the trial court a chance to take remedial action. *See id.* at 305.

■■■ While NRM contends it had to wait until the end of Marx's testimony to determine his basis for his numbers, it is clear that it could have challenged Marx's foundation during questions asked of him during direct or cross examination. NRM's attorney cross-examined Marx at length regarding what information and method he relied on in coming to his conclusion of lost rental value. Marx testified to his exact method of examining comparable properties, including which comparables he examined in person and which ones he did not. NRM could and should have made an objection to Marx's testimony for lack of foundation or moved to strike at this time, not after Marx had already left the stand. This would have allowed the utilization of necessary remedial measures to correct any alleged error. The expert may well have been able to recast his opinion testimony to exclude reliance on any data not properly considered, or may

even have been able to defend his approach as corresponding to the methodology typically employed by experts in the field. To wait until the expert has been excused to attack the foundation of his or her testimony generally will constitute a waiver. *See State v. Phillips*, 319 S.W.3d 471, 476 (Mo.App.2010); *see also State v. Bedell*, 890 S.W.2d 702, 705 (Mo.App.1995) ("[W]here a motion to strike testimony is made after the witness is excused, the trial court will not be convicted of error in denying the motion."). We see no reason it should not be considered a waiver in this case. This point has not been adequately preserved for appeal.

■■■ Rule 84.13(c) permits us to review the appeal, *ex gratia*, for "plain error affecting substantial rights which, though not preserved, resulted in manifest injustice or miscarriage of justice." *Totten v. Treasurer of State*, 116 S.W.3d 624, 628 (Mo.App.2003). We find nothing amounting to manifest injustice here. Marx's testimony regarding damages was neither confusing nor misleading. Even if there had been a reason to believe that part of the opinion testimony was improper, granting a motion to strike all the testimony could have confused and misled the jury to the point of necessitating a mistrial. We discern no error, plain or otherwise. Point Three is denied.

### Point Four

In Point Four, NRM contends the trial court erred in not granting its motion for new trial because McGinnis's counsel inflamed the jury and exacerbated its prejudice by making repeated statements that the jury should "send a message" to NRM, even though no punitive damages were sought in the case.[7] McGinnis's attorney told the jury to "send a message" three times during his closing argument.

---

7. McGinnis argues that NRM's Point Relied On should be dismissed because it does not

comply with Rule 84.04 in that it does not

■ At the end of the first portion of his closing argument, while referencing the amount of money the jury should award McGinnis, counsel told the jury to "send them [NRM] a message." NRM made no objection to this statement. Generally, failing to object to an argument made to the jury at the time it is made results in a waiver of any right to complain about the argument subsequently on appeal. *Amador v. Lea's Auto Sales & Leasing, Inc.*, 916 S.W.2d 845, 852 (Mo.App. 1996). "[T]he objection cannot be raised for the first time in a motion for new trial." *Id.* Because NRM failed to object to counsel's first comment to the jury to "send a message" during trial, and the objection to that comment was not raised until the motion for new trial, NRM's objection to this statement was not preserved for review.

■ After NRM's closing, and at the end of the final portion of McGinnis's closing argument, the alleged objectionable part of the argument went as follows (emphasis added):

MR. WIRKEN [counsel for McGinnis]:

If you come back and you give them a defendant's verdict, there's going to be a circle of folks outside giving high-fives, business as usual. You've got to *send them a message.* You have the power to decide. You have the power to make a difference. You have the power to *send them a message* that enough is enough. Listen to Rhonda McGinnis'[s] plea. Take care of Rhonda McGinnis and all of the other Rhonda McGinnises out there who desperately want to be heard. With what you do here, you can stop people from cramming things down other people's throats—

state a legal ground for the claimed reversible error. NRM's point, while not the clearest, gives a sufficient legal reason for the parties

MR. KELLY [counsel for NRM]:

Your Honor, I apologize and I don't mean to interrupt, but when he talks about sending a message and talking about compensating for other people, that is inappropriate, an inappropriate comment to the jury.

MR. WIRKEN:

I'll rephrase, Your Honor.

THE COURT:

Thank you, Mr. Wirken.

MR. WIRKEN:

The message you send Rhonda McGinnis will be known. So they shouldn't dump things. They shouldn't subject people to what they subjected Rhonda McGinnis to. They shouldn't have to simply put up with it and just shut their mouth.

At this point, the court informed counsel that his argument time had been consumed, and McGinnis's counsel sat down. NRM made no objection that the "rephrasing" was inadequate. NRM also did not request (either before or after the "rephrasing") that counsel be admonished or that the jury be instructed to disregard the remarks about "sending a message." It is not the trial court's duty to represent NRM. At the time of counsel's offer to rephrase, the record suggests that everyone was content with allowing counsel to rephrase. It is not the trial court's role to jump to the rescue of the complaining party *sua sponte* if the rephrasing does little to change the thrust of the argument. We fail to discern any error on the part of the trial court.

■ Now NRM suggests that it was error or an abuse of discretion to deny the motion for new trial; but NRM fails to provide a reason for concluding that there

and the court to understand the argument and respond and is evaluated below.

was some obvious miscarriage of justice perpetrated that would have required the court to grant a new trial. As we have noted, there was no error by the trial court; there was a waiver in that there was no request for further relief; and there is no reason to believe that the argument of McGinnis's counsel inflamed the jury to a feverish sense of outrage against NRM. It is true that Missouri courts have shown displeasure with "send a message" arguments in cases where no punitive damages are recoverable. *Pierce v. Platte–Clay Elec. Coop., Inc.,* 769 S.W.2d 769, 779 (Mo. banc 1989); *Amador,* 916 S.W.2d at 851–52; *Fisher v. McIlroy,* 739 S.W.2d 577, 581–82 (Mo.App.1987). If the "send a message" argument becomes the theme for the entire closing argument, it may constitute reversible error. *See Pierce,* 769 S.W.2d at 779. "Yet, from long experience appellate courts recognize that trial courts are better positioned to assess the amount of prejudice injected by admittedly improper arguments. Having only the cold record on appeal, appellate courts of this state uniformly uphold trial court's determinations of the prejudice injected by 'send a message' arguments." *Beis v. Dias,* 859 S.W.2d 835, 840 (Mo.App.1993) (internal citations omitted); *see also Pierce,* 769 S.W.2d at 778–79; *Henderson v. Fields,* 68 S.W.3d 455, 470–71 (Mo.App. 2001).

For the reasons above, we conclude that the trial court did not abuse its discretion in denying NRM's motion for new trial.

### Conclusion

For the reasons set forth herein, the judgment of the trial court is hereby affirmed.

All concur.