

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| ANDREW WILKINSON, | ) | No. ED111901 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Clinton R. Wright |
| STANLEY FASTENING SYSTEMS, L.P., | ) | |
| | ) | |
| Appellant. | ) | FILED: July 16, 2024 |

## Introduction

Stanley Fastening Systems, L.P. ("Stanley") appeals from the trial court's judgment following a jury verdict in favor of Andrew Wilkinson ("Wilkinson") on his products liability claim. Wilkinson was struck in the eye by a stapler fired from a pneumatic (compressed air-powered) stapler manufactured by Stanley. In one of several points on appeal, Stanley argues the trial court abused its discretion in not granting a mistrial after Wilkinson's counsel repeatedly referred to Stanley as a "billion-dollar company" in express violation of the trial court's order in limine prohibiting any argument regarding Stanley's financial status. Stanley maintains the prejudicial impact of the improper statements is shown by the jury's verdict of $11 million, which Stanley argues was excessive since Wilkinson sought only noneconomic damages. This Court finds that the improper statements were irrelevant, inflammatory, repeatedly violated the order in limine, and were not cured by the trial court sustaining Stanley's objections. Further, we

reasonably may conclude from the size of the verdict that the trial court's error in not granting the requested mistrial prejudiced the outcome of the trial. Therefore, we hold the trial court abused its discretion in denying Stanley's motion for mistrial after the improper references to Stanley's size and wealth as a "billion-dollar" company. Finding reversible error, we grant the point, which is dispositive of the appeal. We reverse the judgment and remand for a new trial.

Factual and Procedural History

The following facts are limited to only those matters relevant to resolving the appeal.

On September 19, 2012, Wilkinson was working as a contractor installing a wood floor. Wilkinson was using a pneumatic stapler gun, model S32SX, manufactured by Stanley in 1994. While sizing and marking floorboards, Wilkinson "tossed" the stapler towards his tool box. The stapler fired a staple, striking Wilkinson in the eye. Wilkinson was not wearing eye protection. Wilkinson's eye was punctured and had to be surgically removed.

On October 13, 2016, Wilkinson filed a first amended petition against Stanley for damages arising out of the incident. Wilkinson proceeded on two theories of negligence:[1] negligent design and negligent failure to warn. For negligent design, Wilkinson argued the stapler was defectively designed because it did not have available and feasible safety devices in the form of a contact trip or dual trigger that would have prevented unintentional firing of staples. For negligent failure to warn, Wilkinson argued the stapler lacked an adequate warning on the risk of harm posed by a stapler lacking safety devices, such as a contact trip or dual trigger, that would have prevented unintentional firing of staples.

The case proceeded to a two-day jury trial. Before trial, Stanley filed a motion in limine to prohibit Wilkinson from referring to or presenting evidence related to Stanley's assets,

_____

[1] Wilkinson also alleged strict liability but did not submit that theory to the jury.

2

revenues, income, or financial resources. The trial court granted the motion and entered an order in limine, to which the parties agreed on the record without objection.

Evidence was presented that the stapler was a trigger-fire device, which fires a staple when the user pulls the trigger. The stapler did not have a contact trip or dual trigger. A contact trip requires the nose of the tool to be placed on the work surface before the stapler can fire a staple. A dual trigger requires the user to press two parts of the stapler to trigger the firing of a staple. The subject stapler had a warning label stating, among other things, the following: "THIS TOOL DOES NOT CONTAIN A CONTACT TRIP AND IS INTENDED FOR USE ONLY WHERE A CONTACT TRIP TOOL CANNOT BE USED DUE TO APPLICATION REQUIREMENTS." The warning label was close to the trigger and worn away, impairing its legibility. The stapler was designed and intended exclusively for use in controlled, industrial production applications. Stanley did not sell or distribute the stapler to consumers in the general public. Stanley limited the distribution of the stapler to industrial users through a loan tool program, in which the users were required to wear personal protective equipment and received training on using the stapler. Wilkinson alleged Stanley knew the staplers could escape the controlled environment of the loan tool program and make their way into the public market, as in Wilkinson's case. Wilkinson had purchased the stapler in 2008 or 2009 from his then-employer, a flooring distributor for whom Wilkinson repaired tools such as pneumatic staplers, who had purchased the stapler from an outside contractor.

During Wilkinson's cross-examination of Stanley's senior safety assurance manager ("Manager") about Stanley's record retention procedures relating to the loan tool program, the following exchange occurred:

> Q: How did Stanley keep track of their records? Did they not have like a server? Did they not keep things digitally?

A:      Yeah, of course, we do.

Q:      So these records related to this program—let me just ask you. These loan tool agreements when it was going on, did they keep those on a computer, digital, a server?

A:      The loan tool agreements? I don't know. I–

Q:      Well, you said that the records went with this business. Did you ship the server with it? Did you say, forget it, we're just getting rid of all this stuff, we're not retaining anything?

A:      I can't answer it 'cause I don't know.

Q:      I'm sorry, do you expect the jury to believe that the billion dollar–

STANLEY:   Objection, your Honor.

THE COURT: Sustained.

Q:      Do you expect me to believe–

STANLEY:   Objection.

THE COURT: Sustained.

Q:      Stanley is a billion-dollar company–

STANLEY:   Objection.

THE COURT: Sustained.

Stanley requested a sidebar outside the hearing of the jury. Stanley moved for a mistrial on the grounds that Wilkinson's counsel knowingly asked three improper questions that violated the order in limine barring Wilkinson from referencing Stanley's financial status. Stanley argued that the express violation could not be cured within the context of a personal injury case seeking millions of dollars in damages. The trial court admonished Wilkinson's counsel to "[s]top doing that, please." Wilkinson's counsel declined, and he posited that his questions were permissible because they related to Stanley's ability to keep track of its records. The trial court then stated:

4

THE COURT: We're going to finish it. We're going to get off of this. I'm overruling your objection and denying your mistrial. Finish the cross-examination.

After the sidebar concluded, Wilkinson's counsel continued cross-examining Manager.

Wilkinson sought only noneconomic damages for pain and suffering, offering testimony from his treating physician, his wife, and himself. Wilkinson testified about the immediate pain he suffered when the 3/8-inch staple shot into his eye, how he had to wait for several hours before a surgeon could remove the staple, and how his eye had to be removed due to the risk of infection. Wilkinson's wife recalled he was screaming in pain at the hospital and making the worst sounds she ever heard a man make. Wilkinson testified about pain he experienced during recovery, including intense vertigo and needing additional surgery to remediate gauze that had grown into his eye. Wilkinson stated that his vision was permanently affected and that he has constant headaches and tunnel vision that at times make him unable to do anything but curl up in his truck and wait for the symptoms to abate. Wilkinson testified he suffers vision-related accidents such as stepping onto uncovered vents, falling, and having difficulty parking cars. Wilkinson described having persistent social and emotional issues, such as how his young children were afraid of him for months. Wilkinson testified that he became socially isolated and stopped playing recreational sports due to fears of suffering further injury. Wilkinson described feeling depressed and disfigured, recalling that he had been voted "prettiest eyes" in high school and that his "better than 20/20" vision had been a point of pride.

At the close of trial, Wilkinson submitted a verdict director for negligent design and failure to warn derived from the Missouri Approved Instructions–Civil ("MAI") 25.09 (8th ed.), which asked the jury to find the following: (1) Stanley manufactured or designed the stapler; (2) the stapler lacked safety devices or mechanisms to prevent the unintentional or unexpected firing

of staples; (3) Stanley failed to use ordinary care to either manufacture or design the stapler to be reasonably safe or adequately warn of the risk of harm from the stapler lacking safety devices or mechanisms to prevent the unintentional or unexpected firing of staples; and (4) Wilkinson was thereby damaged. The jury was also given a comparative fault instruction.

The jury returned a verdict for Wilkinson. The jury awarded Wilkinson $11,000,000 in noneconomic damages for pain and suffering. The jury found Wilkinson thirty percent at fault, reducing his net recovery to $7,700,000. Stanley now appeals.

Points on Appeal

Stanley raises fourteen points on appeal. In Point Ten, Stanley contends the trial court erred in denying Stanley's request for a mistrial following comments by Wilkinson's counsel in the presence of the jury that Stanley was a "billion-dollar company" because such statements were highly prejudicial and inflammatory, and referring to a party's wealth or financial condition was prohibited by the trial court's order and by Missouri law.[2]

Standard of Review

The decision to grant a mistrial "is largely within the discretion of the trial court." Sherrer v. Boston Sci. Corp., 609 S.W.3d 697, 716 (Mo. banc 2020) (internal quotation omitted). We therefore review a trial court's decision to grant or deny a mistrial for "a manifest abuse of discretion." Id. (internal quotation omitted). "To establish a manifest abuse of discretion, a movant must demonstrate 'a grievous error where prejudice cannot otherwise be removed' by any lesser sanction." Id. (internal quotation omitted). We will find an abuse of discretion if the

---

[2] Regarding the other points on appeal, the first three points argue the trial court erred in denying Stanley's motions for a directed verdict and judgment notwithstanding the verdict because Wilkinson failed to make a submissible case on duty or causation. Points Four and Five relate to Wilkinson's expert witnesses and their opinions. Points Six, Seven, Eight, Nine, and Eleven challenge the trial court's rulings on various evidentiary matters. In points Twelve and Thirteen, Stanley challenges the closing argument on the damages award and the jury instructions. Finally, in Point Fourteen, Stanley alleges the trial court erred in denying Stanley's motion for new trial or in the alternative not granting remittitur because the jury's verdict was excessive and disproportionate.

trial court's ruling is clearly against the logic of the circumstances, is arbitrary and unreasonable, and indicates a lack of careful consideration. Pope v. Pope, 179 S.W.3d 442, 461 (Mo. App. W.D. 2005) (en banc) (quoting State ex rel. Ford Motor Co. v. Nixon, 160 S.W.3d 379, 380 (Mo. banc 2005)). "Only if the trial court's decision [to not grant a mistrial] was clearly against reason and resulted in prejudice will we find that the trial court abused its discretion." Coyle v. City of St. Louis, 408 S.W.3d 281, 288 (Mo. App. E.D. 2013) (quoting Woods v. Friendly Ford, Inc., 248 S.W.3d 699, 707 (Mo. App. S.D. 2008)).

## Discussion

Stanley argues the trial court abused its discretion in denying its motion for a mistrial following comments by Wilkinson's counsel that Stanley was a "billion-dollar company." The core of Stanley's argument is that these statements were impermissible because references to the company's wealth were prohibited by Missouri law and by the trial court's orders. Stanley maintains these statements were inflammatory and highly prejudicial by playing to the passions of the jury. As evidence of the prejudicial nature of the repeated "billion-dollar" references made by Wilkinson, Stanley points to the extremely large verdict. Stanley argues that once made in front of the jury, the prejudicial effect of the inflammatory references could not be cured, thereby requiring a mistrial. We agree.

It has been long established in Missouri jurisprudence that references to the size, wealth, and corporate status of a party during trial are improper when intended to arouse prejudice and not within the scope of legitimate argument. Porter v. Toys 'R' Us-Delaware, Inc., 152 S.W.3d 310, 324 (Mo. App. W.D. 2004) (citing Gilbert v. K.T.I., Inc., 765 S.W.2d 289, 300 (Mo. App. W.D. 1988)). Raising matters barred by the trial court's order in limine unquestionably falls outside the scope of legitimate argument. See Woods, 248 S.W.3d at 706–07 (internal citation omitted) (noting plaintiff-appellant's counsel acted improperly by raising an issue barred first by

7

a motion in limine and again by a sustained objection, but ultimately finding the appellant waived his claim of error by affirmatively stating on the record that he was not requesting a mistrial). "Missouri courts have consistently recognized that a comparison between the size, power or wealth of the litigants is improper and can entitle the victimized party to a new trial." Tucker v. Kansas City S. Ry. Co., 765 S.W.2d 308, 312 (Mo. App. W.D. 1988) (citing Green v. Ralston Purina Co., 376 S.W.2d 119, 127 (Mo. 1964); Higgins v. Terminal R.R. Ass'n. of St. Louis, 241 S.W.2d 380, 386 (Mo. 1951)). In Green, the trial court committed reversible error in denying a request for mistrial when counsel improperly described the case to the jury as the "struggle of a little man against one of the biggest corporations in the business" and argued that "[a]ny corporation that can reach out and bring witnesses from Germany, Jefferson City or anywhere else can buy their soul." Green, 376 S.W.2d at 127 (internal quotation omitted). In that case, the Supreme Court of Missouri concluded the improper argument "could have no other effect than to prejudice the corporation in the eyes of the jury and deprive it of its right to a fair and impartial trial." Id. (internal citation omitted). It is nearly always improper for counsel to make an argument referring to the size and wealth of a party. See id.; see also, e.g., Porter, 152 S.W.3d at 324 (acknowledging counsel improperly touched on the corporate-defendant's wealth when arguing corporate leadership did not know or care while "sitting back there in a walnut paneled boardroom" and putting on evidence as expensive as "the cost of a new suit" that could have been better spent investigating plaintiff's in-store injury); Tucker, 765 S.W.2d at 312 (noting counsel improperly argued "this is the only country in the world where we have this type of system, where a man like [plaintiff] is in the same stead and same shoes as . . . a railroad that has got limitless funds"); Cook v. Cox, 478 S.W.2d 678, 682 (Mo. 1972) (noting counsel improperly referred to the defendant in closing as "that big company"); Higgins, 241 S.W.2d at

8

386 (finding counsel improperly argued "it irked me to no end" that "[a] big corporation . . . would seize upon something [relating to plaintiff's drinking] like that"). "Such statements are 'dangerous and harmful indulgences, potent in exciting sympathy or prejudice, and should be discouraged[.]'" Green, 376 S.W.2d at 127 (internal quotation omitted).

Jurisprudential concern over statements focusing on the size, power, or wealth of the litigants is well deserved. Once a jury's attention has been directed to the financial status of the parties, the risk is great that the verdict may have resulted from bias and prejudice relating to a party's wealth and not from the evidence and applicable law. See id. "A mistrial should be declared where it appears impossible for the jury to deliberate dispassionately on the merits of a cause or defense as a result of the action of counsel in charging the atmosphere of the trial with prejudice." Id. While courts are reluctant to grant a mistrial, this drastic remedy is warranted where the prejudicial impact of the improper comment cannot be adequately cured by a trial court's admonishment or limiting instruction. See Higgins, 241 S.W.2d at 386; Coyle, 408 S.W.3d at 288 (internal citations omitted). More simply put, granting a mistrial is the appropriate and required remedy to a party's flagrant introduction of wealth to the jury when the trial court "cannot unring the bell."

Here, Wilkinson's counsel improperly referred to Stanley as a "billion-dollar" company not once but twice during cross-examination of Stanley's corporate witness. The questioning of Manager on the topic of Stanley's record retention became heated in light of Manager's sparse answers. Wilkinson's counsel asked, "I'm sorry, do you expect the jury to believe that the billion dollar–?" This statement drew an immediate objection from Stanley, which the trial court sustained. Wilkinson's counsel then pursued the same line of questioning, again asking, "Do you really expect me to believe–?" Stanley again objected to this statement, which the trial court

sustained. Wilkinson's counsel nevertheless ignored the trial court's rulings and continued his questioning, saying, "Stanley is a billion-dollar company," to which Stanley raised a third objection.

Wilkinson reasons that the "billion-dollar" comments were relevant to the issue of Stanley's retention of records relating to the loan tool program. Even accepting Wilkinson's position that evidence relating to the manner of Stanley's record retention was relevant to Wilkinson's negligence claims, Wilkinson could have questioned Stanley's corporate representative on the matter without referencing Stanley's financial status and certainly could have done so without labeling Stanley as a "billion-dollar" company. We would be naive not to recognize that an able and skilled litigator might seek to use the legitimate scope of impeachment to pursue an end-run around the well-accepted prohibition against introducing the issue of a party's wealth before the jury. Referring to Stanley's financial status flagrantly violated the order in limine and Missouri's general prohibition against referring to a party's size and wealth and was outside the scope of proper relevant evidence. See Tucker, 765 S.W.2d at 312 (citing Green, 376 S.W.2d at 127; Higgins, 241 S.W.2d at 386).[3] We further note that the improper references to Stanley's financial status were not phrased as questions but as statements of fact. See Duggins v. Simons, 517 S.W.2d 82, 96 (Mo. 1974) (affirming the trial court's decision not to grant a mistrial where witness was asked but did not answer whether several of the defendants were millionaires given that the trial court sustained the objection and then instructed the jury to disregard the question). Moreover, Wilkinson's counsel repeated the "billion-dollar" remark

---

[3] In appellate decisions granting no relief due to unpreserved and/or waived claims of errors, some inflammatory comments touching on a party's size or wealth have been found to reasonably relate to the evidence. See, e.g., Veal v. Kelam, 624 S.W.3d 172, 183–84 (Mo. App. E.D. 2020) (finding counsel's un-objected-to closing argument criticizing the use of an expensive expert witness—the party's "10-million-dollar man"—was permissible given evidence about that witness's fees and litigation history); Porter, 152 S.W.3d at 324 (finding counsel's un-objected-to argument that the defendant-company's wealth was being put toward expensive evidence was permissible as a legitimate comment on the evidence of the company's failure to investigate the plaintiff's in-store injury).

again immediately after the trial court sustained Stanley's timely objection. These repeated references, made in knowing disregard and violation of the trial court's order in limine and the trial court's express orders sustaining Stanley's objection to such reference, cannot be countenanced.[4] See Coyle, 408 S.W.3d at 288 (citing Ryan v. Campbell "66" Express, Inc., 304 S.W.2d 825, 828 (Mo. banc 1957)) (noting "[r]epeatedly asking improper questions, offering improper evidence, or displaying material not in evidence may constitute misconduct sufficient for the granting of a new trial"); see also City of Springfield v. Thompson Sales Co., 71 S.W.3d 597, 600–01 (Mo. banc 2002) (holding the trial court prejudicially erred in denying a mistrial for multiple voir dire comments that violated the order in limine barring any improper suggestion that a particular verdict may impact the jurors' tax burden). Referencing the size and wealth of a defendant-corporation presumably hopes "to arouse some prejudice the jurors or some of them may have had for corporations, to help 'drive home' to the jury counsel's scornful view of the conduct of defendant." Higgins, 241 S.W.2d at 386. Such argument undermines judicial integrity.

Courts have denied appellate relief when the complaining party did not object to the improper comment at trial. See Veal v. Kelam, 624 S.W.3d 172, 183 (Mo. App. E.D. 2020) (finding the respondent's allegedly inflammatory closing argument could not rise to trial court error where the appellant failed to object to the argument at trial); Porter, 152 S.W.3d at 323–24 (finding no miscarriage of justice amounting to plain error in closing argument that touched on

---

[4] Following the sidebar conference, the trial court indicated that it was overuling the objection and denying the mistrial. The record shows Stanley made three objections, each of which was sustained by the trial court. Given the general nature of the trial court ruling, it is difficult to discern if it intended to reverse its three prior evidentiary rulings and deny the request for mistrial or simply deny the request for mistrial without addressing its prior evidentiary rulings. The fact that Wilkinson made no further comment or reference to Stanley's wealth or financial status following the sidebar suggests the trial court's ruling was not viewed by the parties as permitting reference to Stanley's corporate wealth. Moreover, even if the ruling is interpreted as reversing the trial court's three prior evidentiary rulings, this fact does not mitigate Wilkinson's knowing violation of the order in limine or his continued violation of the trial court's initial rulings sustaining Stanley's objections to the "billion-dollar" company reference.

11

the defendant-corporation's wealth but otherwise legitimately commented on the evidence); Higgins, 241 S.W.2d at 386 (finding that although the plaintiff's reference to the defendant as a "big corporation" was improper and not within the scope of legitimate argument, the defendant failed to contest the adequacy of the trial court's mild reprimand to stay within the evidence). Here, in contrast, Stanley objected to each "billion-dollar" reference. Further, Stanley timely sought a mistrial. See Woods, 248 S.W.3d at 706–07 (finding a plaintiff-employee waived review of his claim that the trial court erred in not granting a mistrial following defendant-employer's questions violating an order in limine, to which he successfully objected, because he affirmatively stated he was not seeking a mistrial). After Wilkinson's counsel ignored the sustained objections, the trial court admonished Wilkinson's counsel to stop his improper line of questioning at sidebar—outside the hearing of the jury. The circumstances of this admonition preclude it from serving as a basis for curing the prejudice occasioned by the improper statements. The Supreme Court of Missouri has observed that "a strong admonition *to the jury* to disregard the [improper] comment can be sufficient in some cases to ameliorate the prejudice[.]" City of Springfield, 71 S.W.3d at 601 (emphasis added) (internal citations omitted) (holding no such prejudice mitigation was possible where counsel improperly suggested the jurors' taxes could be raised to pay any award granted); see also Faught v. Washam, 329 S.W.2d 588, 601 (Mo. 1959), *overruled on other grounds by* Tune v. Synergy Gas Corp., 883 S.W.2d 10 (Mo. banc 1994) (finding plaintiff's counsel's remark that the plaintiff was "certainly not motivated by any desire to place a hardship upon [the defendant] personally" was "grossly and patently improper" in the context of seeking damages for which prejudice was not cured by the trial court's "mild and perfunctory" ruling sustaining the objection and directing the jury to disregard the comment). In this case, Stanley pointedly argued that the improper references to its

financial status could not be cured.  See Coyle, 408 S.W.3d at 288 (internal quotation omitted) (noting "the final question is whether the conduct substantially influenced the verdict, despite the action taken at the time by the court, in sustaining objections or otherwise").  As Stanley argues, any prospective curative instruction may have only served to further highlight the improper comments by directing the jury's attention to them.[5]  What is clear from the record is that Wilkinson made repeated references to Stanley as a "billion-dollar" company in front of the jury with absolutely no indication from the trial court to the jury that such reference was an improper consideration for their deliberation as jurors.  As explained below in the discussion of the jury's verdict award, we are persuaded the prejudicial impact here is more similar to reversible grounds in City of Springfield and Green than to unpreserved claims in Veal and Higgins.

In support of its argument that a mistrial was necessary to redress the prejudicial effect of the improper "billion-dollar" company statements, Stanley directs us to consider the large size of the verdict.  "The amount of the verdict does not by itself establish bias or passion and prejudice without showing some other error was committed during the trial."  Stewart v. Partamian, 465 S.W.3d 51, 56 (Mo. banc 2015) (internal citation omitted); Lindquist v. Scott Radiological Grp., Inc., 168 S.W.3d 635, 646 (Mo. App. E.D. 2005) (internal quotation omitted).  However, the amount of the verdict is highly relevant in determining whether some other trial court error, here the failure to declare a mistrial, was prejudicial.  See Lindquist, 168 S.W.3d at 646 (internal citations omitted) (noting an excessive verdict "savors of misbehavior on the part of the jury"); Pope, 179 S.W.3d at 465 n.19 (finding a jury's award that exceeds the amount requested by

---

[5] Whether the trial court even would have entertained a curative instruction depends on whether its general ruling "overruling the objection and denying the mistrial" was meant to be a reversal of his prior evidentiary rulings.  If so, then logically the trial court would have seen no need for a curative instruction since he would have found no violation of Missouri law with the "billion-dollar" company reference.  The inconsistency in the trial court's rulings and lack of any explanation adds to the challenges presented in addressing this point on appeal.

13

plaintiff's counsel "is, of course, a concrete indication of [the challenged evidence's] unfairly prejudicial effect in producing an award of that size"); see also Ventura v. Kyle, 825 F.3d 876, 885 (8th Cir. 2016) (internal quotations omitted) (holding a jury's large verdict, while "not beyond the bounds of rationality," supported finding that a closing argument improperly referring to insurance coverage, for which the jury received no curative instruction, "accomplish[ed] the purpose which it was clearly intended to accomplish, namely, the enhancement of damages").

Here, we are persuaded that the very large damage award supports finding prejudicial error in the trial court's denial of Stanley's request for a mistrial following Wilkinson's counsel's repeated improper references to Stanley's financial status. The jury awarded Wilkinson $11 million in noneconomic damages relating to the loss of his eye.[6] Noneconomic damages is a broad category in which "pain and suffering" defy precise calculation. See Stewart, 465 S.W.3d at 58; see also Graeff v. Baptist Temple of Springfield, 576 S.W.2d 291, 302 (Mo. banc 1978) (quoting Faught, 329 S.W.2d at 602) (explaining "the judicial measure of damages for pain and suffering has been fair and reasonable compensation . . . because there is and can be no established standard, fixed basis, or mathematical rule by which such damages may be calculated"). In his petition, Wilkinson sought only an award of noneconomic damages and strategically elected not to seek special damages, such as medical expenses or lost wages, which are subject to specific pleading requirements and more defined calculations or even statutory caps in other civil actions. See e.g., Section 538.210, RSMo (2016) (limiting awards for noneconomic damages in medical negligence cases not involving death to $400,000); Schieffer v. DeCleene, 539 S.W.3d 798, 804 (Mo. App. E.D. 2017) (noting expenses for medical services

---

[6] The award was reduced to a net recovery of $7.7 million due to the jury's assessment of comparative fault.

are considered special damages that must specifically pleaded and proved with evidence, such as from medical bills); Franklin v. Byers, 706 S.W.2d 230, 231–32 (Mo. App. W.D. 1986) (noting lost wages may be proved by testimony about average earnings and tax returns). The trial court ruled that because Wilkinson was not seeking economic damages or lost wages, he was limited to testifying about reputation and enjoyment related to work but not lost jobs or lost dollars. Wilkinson in fact testified that his business was doing well with increased earnings, although it was harder to win bids with a visible deformity that made prospective clients ill at ease.

Given the absence of a brightline test to determine noneconomic losses, McGinnis v. Northland Ready Mix, Inc., 344 S.W.3d 804, 812 (Mo. App. W.D. 2011) (internal citation omitted), we would be reluctant to conclude from the evidence that the award is so large as to constitute error in and of itself either by honest mistake or by bias and prejudice. See Lindquist, 168 S.W.3d at 646 (internal quotation omitted); see also Stewart, 465 S.W.3d at 56; Veal, 624 S.W.3d at 181 (internal quotation omitted). Wilkinson adduced evidence of past and future pain, embarrassment, and effect on lifestyle. See Payne v. Fiesta Corp., 543 S.W.3d 109, 131 (Mo. App. E.D. 2018) (quoting Stewart, 465 S.W.3d at 57). Among such evidence, Wilkinson testified about the pain he suffered when the 3/8-inch staple shot into his eye and how he had to wait for several hours before a surgeon could remove the staple and, ultimately, the eye itself due to the risk of infection. Wilkinson also experienced pain during recovery, including needing additional surgery and suffering vertigo. Wilkinson testified that his vision was permanently damaged and that he has tunnel vision and constant headaches, which make him unable to function until the symptoms abate. Regarding his work as a contractor, Wilkinson explained that he suffers vision-related accidents such as stepping onto uncovered vents, falling down stairs, and having difficulty parking cars. Outside of work, Wilkinson testified to persistent social and

15

emotional issues, social isolation, and feeling depressed and disfigured, like how his young children were afraid of him for months, while strangers stared at him in public. We are acutely aware that the question before us is not whether the award presented its own basis for error. Rather, we must consider whether the size of the award indicates prejudice resulting from other trial court error, namely, the trial court's refusal to grant the requested mistrial after the repeated improper references to Stanley as a "billion-dollar" company. See Stewart, 465 S.W.3d at 56; Pope, 179 S.W.3d at 465–66.

We are mindful that the application of the individual facts of each case to the law guides our analysis and resolution of the appeal. The specific facts before us include the making of repeated, inflammatory statements in the presence of the jury that not only violated the order in limine, but were of such an incurable nature that the trial court's limited action in merely sustaining Stanley's objections in the presence of the jury, without some form of admonition or curative instruction to the jury, was insufficient to curb the bias and prejudice resulting from those statements. Indeed, the nature of Stanley's objection was never made known to the jury, and the jury was given no guidance as to how to consider or not consider the "billion-dollar" reference in deliberations. We are further persuaded that the very real threat of bias and prejudice is evidenced by the large jury verdict. See City of Springfield, 71 S.W.3d at 601; Green, 376 S.W.2d at 127. Inflammatory references to the large size and wealth of a defendant are likely to provoke a jury to apply the 'deep pocket' theory of liability and to enhance the size of the verdict relative to the defendant's perceived ability to pay. We simply cannot ignore the very real potential that Wilkinson's counsel's calculated and inflammatory statements relating to Stanley's "billion-dollar" status impacted the jury's consideration of liability. Our culture today is very much impacted by the characterization of entities or people as "billionaires." The

16

pinnacle of financial success is characterized as having wealth in the billions. Yet this characterization often is not intended or viewed in a positive light, especially when contrasted with the less financially fortunate, a contrast that was highlighted here when Wilkinson testified that his lack of insurance affected his hospital treatment. Indeed, wrongfully introducing the issue of immense corporate wealth reasonably can be viewed as a tactic to take advantage of widespread accusations of corporate greed and disregard for workers and consumers, which has become a common topic in society today.

While acknowledging the considerable discretion accorded trial courts in matters of granting a mistrial, that discretion is not unbridled. See Delacroix v. Doncasters, Inc., 407 S.W.3d 13, 24–25 (Mo. App. E.D. 2013) (citing City of Springfield, 71 S.W.3d at 601); see also Green, 376 S.W.2d at 127 (noting that when counsel makes improper argument about the relative size, wealth, and power of the litigants, "[i]t is the duty of the trial judge to stop such an argument at its inception; to instruct the jury to disregard it, and to reprimand counsel"). Given the facts before us, we hold that the trial court's denial of Stanley's request for a mistrial was unreasonable and indicated a lack of careful consideration. The practical effect of the trial court's handling of this matter allowed the defendant-corporation's financial status to be improperly placed before the jury and impact its verdict. See Green, 376 S.W.2d at 127. Accordingly, the trial court manifestly abused its discretion. See Sherrer, 609 S.W.3d at 716 (internal quotation omitted). The point on appeal is granted.

### Conclusion

The judgment of the trial court is reversed. The cause is remanded to the trial court for a new trial.

_____
KURT S. ODENWALD, Presiding Judge

17

Michael E. Gardner, J., concurs.
Renée D. Hardin-Tammons, J., concurs.